IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT
_____

No. 09-36026
_____

THE LANDS COUNCIL,
*Plaintiff-Appellant*,
v.

RANOTTA MCNAIR, In her Official Capacity as Forest Supervisor
for the Idaho Panhandle National Forests; and THE UNITED STATES FOREST
SERVICE ,
*Defendants-Appellees*,

BOUNDARY COUNTY; CITY OF BONNERS FERRY; CITY OF MOYIE
SPRINGS; EVERHART LOGGING, INC.; and REGEHR LOGGING, INC.
*Defendants-Intervenors-Appellees*.

_____

On Appeal from the
United States District Court for the District of Idaho
_____

**BRIEF FOR THE FEDERAL APPELLEES**

IGNACIA S. MORENO
Assistant Attorney General

OF COUNSEL:                         DAVID C. SHILTON
                                    SUSAN L. PACHOLSKI
ALAN J. CAMPBELL                     U.S. Department of Justice
 U.S. Department of                  Environment & Natural Resources Division
   Agriculture                       P.O. Box 23795
 Office of the General               L'Enfant Plaza Station
   Counsel                           Washington, D.C. 20026
 Missoula, Montana                   (202) 307-6105

# TABLE OF CONTENTS

STATEMENT OF JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE ISSUES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    A.    Nature of the Case. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    B.    Statutory and Regulatory Background. . . . . . . . . . . . . . . . . . . . . . . . . 5

        1.    The National Forest Management Act of 1976. . . . . . . . . . . . 5

            a.  Forest plans. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

            b.  Site-specific projects. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

        2.    The National Environmental Policy Act. . . . . . . . . . . . . . . . . 7

        3.  The Administrative Procedure Act. . . . . . . . . . . . . . . . . . . . . . 8

    C.    Course of Proceedings and Disposition in the Court Below . . . . . . . 8

        1.    The Mission Brush Project. . . . . . . . . . . . . . . . . . . . . . . . . . . 8

        2.    The Supplemental Environmental Impact Statement and
               Record of Decision. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

        3.    The Preliminary Injunction Ruling and Appeal. . . . . . . . . . . 14

        4.    The Summary Judgment Ruling. . . . . . . . . . . . . . . . . . . . . . . 17

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

I.     THE FOREST SERVICE IS IN COMPLIANCE WITH THE IPNF PLAN REQUIREMENT TO MAINTAIN 10% OF THE FOREST AS OLD GROWTH. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

     A.    No Old Growth Will Be Harvested As Part of the Mission Brush Project. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

     B.    The Forest Service's Conclusion That More Than 10% Of The IPNF Is Old Growth Is Entitled To Deference. . . . . . . . . . . . . . . . 28

          1.    The FIA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

          2.    The TSMRS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

II.    LANDS COUNCIL FAILED TO EXHAUST AND WAIVED ITS CHALLENGES TO THE 10% OLD GROWTH STANDARD. . . . . . . . . 46

III.   THE FOREST SERVICE'S CONCLUSION THAT THE PROJECT WILL NOT AFFECT THE VIABILITY OF MANAGEMENT INDICATOR AND SENSITIVE SPECIES IS ENTITLED TO DEFERENCE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

# TABLE OF AUTHORITIES

## CASES:

*Arrington v. Daniels*,
    516 F.3d 1106 (9th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Baltimore Gas & Elec. Co. v. Natural Resources Defense Council, Inc.*,
    462 U.S. 87 (1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Blue Mountains Biodiversity Project v. Blackwood*,
    161 F.3d 1208 (9th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

*Buckingham v. Secretary, U.S. Dep't of Agriculture*,
    2010 WL 1712487 at *5 (9th Cir. 2010) . . . . . . . . . . . . . . . . . . 33, 40-41, 47

*Cold Mountain v. Garber*,
    375 F.3d 884 (9th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34, 48

*Dickinson v. Zurko*,
    527 U.S. 150 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Ecology Center, Inc. v. Austin*,
    430 F.3d 1057 (9th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14-15

*Ecology Center v. Castaneda*,
    574 F.3d 652 (9th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . 23, 31, 48-49

*Envtl. Prot. Info. Ctr. v. U. S. Forest Service*,
    451 F.3d 1005 (9th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Idaho Conservation League v. Mumma*,
    956 F.2d 1508 (9th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Idaho Sporting Congress, Inc. v. Rittenhouse*,
    305 F.3d 957 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Inland Empire Public Lands Council v. U.S. Forest Service,*
    88 F.3d 754 at 757 (9th Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Kootenai Tribe of Idaho v. Veneman,*
    313 F.3d 1094 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Lands Council v. McNair,*
    494 F.3d 771 (9th Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 14

*Lands Council v. McNair,*
    537 F.3d 981 (9th Cir. 2008) (*en banc*). 4,15-17,22, 23,25,27,40,41,50,53-55

*Lands Council v. Powell,*
    395 F.3d 1019 (9th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10, 19, 40

*Lands Council v. Vaught,*
    198 F. Supp. 2d 1211 (E.D. Wash. 2002) . . . . . . . . . . . . . . . . . . . . . . . . 45

*Lujan v. Nat'l Wildlife Fed'n,*
    497 U.S. 871 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Marsh v. Oregon Natural Resources Council,*
    490 U.S. 360 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 17

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Native Ecosystems Council v. Dombeck,*
    304 F.3d 886 (9th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Native Ecosystems Council v. Tidwell,*
    599 F.3d 926 (9th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

*Northwest Environmental Advocates v. National Marine Fisheries Serv.,*
    460 F.3d 1125 (9th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Norton v. Southern Utah Wilderness Alliance,*

542 U.S. 55 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*Ohio Forestry Ass'n v. Sierra Club*,
    523 U.S. 726 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5-6

*Selkirk Conservation Alliance v. Forsgren*,
    336 F.3d 944 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Sierra Club v. Robertson*,
    28 F.3d 753 (8th Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Southwest Center For Biological Diversity v. United States Forest Service*,
    100 F.3d 1443 (9th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35-36

*Swanson v. United States Forest Service*,
    87 F.3d 339 (9th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Vermont Yankee Nuclear Power Corp. v. NRDC*,
    435 U.S. 519 (1978). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Wetlands Action Network v. U.S. Army Corps of Engineers,*
    222 F.3d 1105 (9th Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 26

*Wilderness Society v. Bosworth*,
    118 F.Supp.2d 1082 (D. Mont. 2000) . . . . . . . . . . . . . . . . . . . . . . . . 32

*Wildwest Institute v. Bull*, 547 F.3d 1162 (9th Cir. 2008) . . . . . . . . . . . . . . . . . . 60

**STATUES, RULES AND REGULATIONS:**

Administrative Procedure Act ("APA"),
    5 U.S.C. §§ 701–706 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
    5 U.S.C. § 704 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
    5 U.S.C. § 706(2)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

7 U.S.C. § 6912(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Multiple-Use Sustained-Yield Act of 1960,
    16 U.S.C. §§ 528-531 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

The National Forest Management Act of 1976. . . . . . . . . . . . . . . . . . . . . . . . . . . 6
    16 U.S.C. § 1604(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
    16 U.S.C. § 1604(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    16 U.S.C. § 1604(f) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
    16 U.S.C. § 1604(g)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
    16 U.S.C. §1604(g)(3)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49
    16 U.S.C. § 1604(I). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

28 U.S.C. § 1291. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
28 U.S.C. § 1331. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

The National Environmental Policy Act,
    42 U.S.C. § 4321 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
    42 U.S.C. § 4332(C). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Federal Rule of Appellate Procedure 4(a)(1)(B) . . . . . . . . . . . . . . . . . . . . . . . . 2

36 C.F.R. 251.101 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

58 Fed. Reg. 19,369 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

_____

No. 09-36026

_____

THE LANDS COUNCIL,

*Plaintiff-Appellant*,

v.

RANOTTA MCNAIR, In her Official Capacity as Forest Supervisor
for the Idaho Panhandle National Forests; and
THE UNITED STATES FOREST SERVICE ,

*Defendants-Appellees*,

BOUNDARY COUNTY; CITY OF BONNERS FERRY; CITY OF MOYIE
SPRINGS; EVERHART LOGGING, INC.; and REGEHR LOGGING, INC.

*Defendants-Intervenors-Appellees*.

_____

On Appeal from the
United States District Court for the District of Idaho

_____

**BRIEF FOR THE FEDERAL APPELLEES**

_____

**STATEMENT OF JURISDICTION**

The district court had jurisdiction pursuant to 28 U.S.C. § 1331. The court

issued a summary judgment in favor of defendants Ranotta McNair, Forest

Supervisor of the Idaho Panhandle National Forests, and the United States Forest

Service (together the "Forest Service") on September 30, 2009, and a final

judgment was entered on that day. Appellant's excerpts of record ("ER") 1, 373.

The Lands Council filed a notice of appeal on November 18, 2009, which was within the 60 days provided by Federal Rule of Appellate Procedure 4(a)(1)(B). This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

This case challenges the Forest Service's decision, as part of the Mission Brush Project in the Idaho Panhandle National Forests ("IPNF"), to thin out younger, smaller diameter understory trees and remove ladder fuels (vegetation such as shrubs, understory trees or branches that convey fire from the ground to the old growth canopy), from 277 acres of old growth forest, in an attempt to restore more open, healthy old growth conditions. The issues presented in this appeal are as follows:

1.  Whether the Forest Service is in compliance with the IPNF Plan requirement to maintain 10% of the Forest as old growth.

2.  Whether this Court should decline to consider Lands Council's challenges to the adequacy of the 10% old growth standard, because Lands Council failed to raise its first argument in the administrative appeal process, and failed to raise the second in the district court.

3.  Whether the Forest Service's determination that the Mission Brush Project was in compliance with IPNF Plan requirements for maintaining old

growth dependent species' viability and monitoring population levels of indicator species is entitled to deference and should be upheld.

## STATEMENT OF THE CASE

### A. Nature of the Case.

Lands Council challenges the Forest Service's decision to thin undergrowth from 277 acres of old growth forest as part of the Mission Brush Project in the Idaho Panhandle National Forests. The Forest Service's goal in treating the old growth areas is to restore more open conditions that promote the health and growth of the large, old trees, and to improve habitat for wildlife species associated with this type of habitat. Open grown forests of ponderosa pine, western larch, and Douglas-fir "have declined by approximately 80% from historic conditions to the present," due to the ingrowth of shade tolerant, drought- and insect-intolerant species, "leaving a forest that is highly vulnerable to drought stress, insect and disease infestation, and high intensity fires." ER250-251. By removing ladder fuels from below and around old trees, the Forest Service aims to lower the risk of stand-replacing crown fires (fires that advance from treetop to treetop), and hopes to reintroduce into the ecosystem the role of low-intensity fire, which historically helped maintain healthy conditions in old growth stands. ER327.

Lands Council and Wildwest Institute, which is not a party to this appeal, filed suit alleging, among other things, that the Forest Service failed to comply

3

with standard 10(b) of the IPNF Plan, which requires the Forest Service to maintain at least 10% old growth throughout the forest, and by failing to demonstrate the reliability of the scientific methodology underlying its analysis of the Project's effects on old growth dependent species. Plaintiffs also contended that the Forest Service failed to adequately address the uncertainty concerning its proposed treatment of old growth stands as a strategy to maintain species viability.

The district court denied plaintiffs' motion for a preliminary injunction, holding that plaintiffs had not demonstrated probable success on the merits of their claims or the possibility of irreparable harm. Plaintiffs appealed, and a panel of this Court reversed. *Lands Council v. McNair*, 494 F.3d 771 (9th Cir. 2007). The Forest Service sought review *en banc*, which this Court granted, and the *en banc* panel affirmed the district court's denial of the preliminary injunction. *Lands Council v. McNair*, 537 F.3d 981 (9th Cir. 2008) (*en banc*) .

The district court granted the Forest Service's motion for summary judgment, holding that the Forest Service's conclusion that the Project was in compliance with Forest Plan requirements for maintaining old growth, ensuring the viability of old growth dependent species, and monitoring population levels of indicator species was "well supported in the record" and was not arbitrary or capricious. ER 34-35. Lands Council filed this appeal.

**B.    Statutory and Regulatory Background.**

1.  **<u>The National Forest Management Act of 1976.</u>**

The Forest Service is responsible for managing the 192 million acres of land

that comprise the National Forest System.  *See* 58 Fed. Reg. 19,369 (1993).

Pursuant to the Multiple-Use Sustained-Yield Act of 1960, ("MUSYA"), 16 U.S.C.

§§ 528-531, the Forest Service manages National Forest System lands for multiple

uses under the balance the agency deems will "best meet the needs of the American

people [and] mak[e] the most judicious use of the land" under its jurisdiction.  *Id.*

§ 531(a).  The uses expressly authorized are diverse and include "outdoor

recreation, range, timber, watershed, and wildlife and fish purposes."  *Id.*  § 528.

The concepts of multiple use and sustained yield remained central in Forest Service

land management planning when MUSYA was incorporated into the 1976 National

Forest Management Act  ("NFMA"), 16 U.S.C. § 1604(e).

Pursuant to NFMA, forest planning occurs in two distinct stages:  broad-

based forest plans and site-specific projects, such as the Mission Brush Project.

*See Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 729-30 (1998).  These two

levels of planning are described below.

a.  **Forest plans.**   NFMA directs the Secretary of Agriculture

("Secretary"), acting through the Forest Service, to develop a land and resource

management plan ("forest plan" or "plan") for each unit of the National Forest

System.  16 U.S.C. § 1604(a).  Plans are the first step in staged decisionmaking,

and establish comprehensive, programmatic planning goals and objectives for individual units of the National Forest System for ten- to fifteen-year periods. 16 U.S.C. § 1604(f); *see also Ohio Forestry*, 523 U.S. at 729. Forest plans are designed to provide broad guidance for the Forest Service's management activities, to establish forest-wide management goals and standards, and to set forth the desired future condition for the forest. *See Sierra Club v. Robertson*, 28 F.3d 753, 758–59 (8th Cir. 1994).

      **b. Site-specific projects**. At the project stage, individual activities and projects are proposed, analyzed, and decided upon. Specific actions, such as resource plans, permits, contracts, and other instruments for the use of National Forest System lands, must be consistent with the forest plan. 16 U.S.C. § 1604(I). Both forest planning stages incorporate the National Environmental Policy Act's procedural requirements. *See* 16 U.S.C. § 1604(g)(1); *Ohio Forestry*, 523 U.S. at 730; *Idaho Conservation League v. Mumma*, 956 F.2d 1508, 1511 (9th Cir. 1992); *Inland Empire Public Lands Council v. U.S. Forest Service,* 88 F.3d 754 at 757 (9th Cir. 1996).

     **2. <u>The National Environmental Policy Act.</u>**

    The National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et seq.*, requires federal agencies to examine the environmental effects of proposed federal actions, and to inform the public of the environmental factors that were

considered in the agency's decisionmaking.  *Baltimore Gas & Elec. Co. v. Natural Resources Defense Council, Inc.*, 462 U.S. 87, 97 (1983).  If an agency proposes to undertake "a major Federal action[] significantly affecting the quality of the human environment," NEPA requires the agency to prepare an environmental impact statement ("EIS") setting forth, among other things, the unavoidable adverse environmental effects of the proposed action and examining alternatives to the action.  42 U.S.C. § 4332(C).

NEPA prescribes procedural requirements; it "does not work by mandating that agencies achieve particular substantive environmental results."  *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 371 (1989); *Northwest Environmental Advocates v. National Marine Fisheries Serv.*, 460 F.3d 1125, 1133 (9th Cir. 2006); *see also  Inland Empire,* 88 F.3d at 758 (NEPA's goal is satisfied if information on environmental impacts is disclosed).  NEPA is designed to "insure a fully informed and well-considered decision, not necessarily a decision the [reviewing judges] would have reached had they been members of the decisionmaking unit of the agency."  *Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 558 (1978).

**3.  The Administrative Procedure Act.**

Because neither NEPA nor NFMA specifically authorizes suit against an agency for non-compliance, suits alleging violations of those statutes must be

brought pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C.

§§ 701–706. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 882-83 (1990); *Envtl.*

*Prot. Info. Ctr. v. U. S. Forest Service*, 451 F.3d 1005, 1008 (9th Cir. 2006).

## C. Course of Proceedings and Disposition in the Court Below.

### 1. The Mission Brush Project.

The Mission Brush Project is located in the northern portion of the Bonners

Ferry Ranger District in the IPNF. ER201. The project assessment area

encompasses the Mission and Brush Creek watersheds and is approximately

31,350 acres in size. Of those, 16,650 acres are National Forest System land;

7,490 acres are private land, and 7,300 acres of the Mission Creek watershed in

Canada were included in the aquatics cumulative effects analysis area. *Id.*

Historically, the project assessment area consisted of open ponderosa pine

and Douglas-fir stands, maintained in part by relatively frequent low- to medium-

intensity fires. Today the composition of the forest has shifted, largely due to fire

suppression, past logging practices, and white pine blister rust fungus, towards

densely crowded stands of younger, shade-tolerant species that are more

susceptible to insect infestations, disease, drought, and intense, stand-replacing

fires. Supplemental Excerpts of Record ("SER") 109. As the Forest Service has

explained, "the densely stocked stands we see today are causing a general health

and vigor decline in all tree species." SER110.

In May 2004, the Forest Service released the Mission Brush Final EIS and Record of Decision ("ROD").  ER200, 317.  On June 15, 2004, Lands Council and five other organizations filed an administrative appeal of the ROD.  On August 30, 2004, the Forest Service's Appeal Deciding Officer upheld the decision, but delayed implementation of the Project in light of this Court's ruling in *Lands Council v. Powell*, 395 F.3d 1019 (9th Cir. 2005), which raised various concerns regarding management of the IPNF.  ER319 .  The Forest Service decided to prepare a supplemental EIS in order to further develop and consider the issues raised by *Powell*.

**2.  The Supplemental Environmental Impact Statement and Record of Decision.**  On April 20, 2006 the Forest Service issued a Supplemental Final Environmental Impact Statement ("SFEIS") and ROD.[1]  In response to this Court's ruling in *Powell*, the SFEIS contained additional information on "past timber harvests and associated activities in the Project's cumulative effects area, the methodologies used for analysis of wildlife and fisheries, soil conditions, and stands of old-growth trees."  ER203.  The SFEIS examined a no-action alternative and three action alternatives, including the recommended alternative, Alternative 2.  SER72-108, 180-181.

_____

[1] The entire text of the Mission Brush SFEIS and ROD can be found on the IPNF's website, at fs.usda.gov/goto/ipnf/missionbrush.

The Forest Supervisor selected Alternative 2 of the SFEIS with minor modifications. ER318. Under the selected alternative, the Forest Service will implement silvicultural treatments on 3,829 acres, fuels treatment (grapple piling and controlled burns) on 3,698 acres, and ecosystem burns without harvest on 238 acres. *Id*. Some harvest of smaller trees will take place in 277 acres of old growth forest, followed by fuels treatments. The Forest Service will also decommission 13 miles of existing roads, construct five miles of temporary roads that it will decommission after use, improve 39 miles of existing roads, and place five miles of existing roads into storage. *Id*. The Forest Service will also implement several recreational improvements within the Project area. *Id*.

The ROD explained that the selected alternative would have several beneficial effects on forest vegetation. ER320. It would move forest composition and structure in the Project area closer to historic patterns, so that in the long term there will be an increase in long-lived seral species such as ponderosa pine, western larch, and white pine, and a decrease in short-lived species such as lodgepole pine, Douglas-fir, and grand fir. *Id*. The treatments will trend the forest structure toward more open conditions with large-diameter, fire-resistant trees, and will bring the dry forest types closer to historic conditions, when low- to medium-severity fires were the primary fire regime. The Forest Service calculated that within the Project area, the probability of stand-replacing fire (the larger fires that

10

remove most of a forest stand) occurring in dry forest areas will be reduced by about 20%, and would be reduced by about 50% within the treated units. *Id.* In addition, reducing the amount of Douglas-fir and grand fir will reduce the risk of root disease and insect-related tree mortality by an estimated 35 percent. *Id.* Conversion to open stands of species less susceptible to root disease will also decrease competition for limited water and nutrients. *Id.*

The ROD explained that "there are differing opinions regarding [] management" of old growth, and that in reaching her decision to treat old growth, the Forest Supervisor "weighed the desires of those who want old growth to remain untouched against the need to return the role of fire back into the ecosystem, particularly in ponderosa pine stands with old growth characteristics, and to restore dry forest structure to open conditions featuring large diameter ponderosa pine." ER330. As the ROD stated, these trees "need relatively open spaces to maintain modest growth rate and survive several hundred years." ER327.

Prescribed fire alone was considered as an alternative in old growth stands, but it was eliminated from detailed study because "under current conditions the type of fire needed to kill competing vegetation would likely kill most of the old growth trees we are trying to maintain." ER327. The Forest Service therefore decided to remove ladder fuels "from below and around the large old relic trees to lower the risk of stand-replacing crown fires." ER330. The ROD explained that

11

the "treatments will not only maintain the old growth character of these stands, but they will provide future managers with viable options" for using controlled burns effectively. ER327. The ROD made clear that "there will be no entry into moist site (cedar-hemlock) or cool-moist (subalpine fir) old growth." ER330.

The average-sized tree to be removed in the old growth stands would be a Douglas-fir about 12 inches in diameter, and the average tree left standing would be a ponderosa pine 20 inches in diameter. ER327. Large, old Douglas-fir would be maintained as well, as would trees from smaller size classes to provide "additional structural diversity and replacement old growth for the future." ER330. Because the proposed treatments would not result in a net loss of allocated old growth, the Forest Service concluded that "Forest Plan standards for old growth maintenance and distribution would continue to be met." *Id.* In conclusion, the Forest Supervisor stated that she believed "my decision provides greater assurance that the dry site forest conditions in the project area will be more sustainable for old growth characteristics compared to not treating these areas." *Id.*

The ROD explained that "wildlife habitat restoration has been incorporated into design of the vegetation treatments," ER323, and that the selected alternative "does the most to promote long-term persistence and stability of wildlife habitat through vegetation treatments, road decommissioning and ecosystem burning on about 238 acres." ER326. "Managing wildlife habitat is not a 'one-size-fits-all'

solution when it comes to the needs of the various species," the ROD stated, but the chosen alternative "includes the greatest amount of vegetation treatments and thus does the most to respond to future risks to habitat components for the following species: Canada lynx, grizzly bear, flammulated owl, northern goshawk, fisher, pileated woodpecker, and forest land birds." ER331.

## 2. **The Preliminary Injunction Ruling and Appeal.**

Lands Council and other environmental advocacy organizations filed an administrative appeal of the ROD, which was denied. SER346-430. Lands Council and Wildwest Institute (which is not a party to this appeal) filed this suit in October, 2006, alleging that the Forest Service's decision to proceed with the Mission Brush Project violated NFMA, NEPA, the Clean Water Act, and the APA. SER28. Plaintiffs filed a motion for a temporary restraining order and preliminary injunction to enjoin the Forest Service from proceeding with the Project. The district court denied the motion, concluding that the plaintiffs had not established the existence of serious questions going to the merits of their claims, nor had they demonstrated a fair chance of success on the merits such that the balance of hardships tipped in their favor. ER16.

Lands Council appealed, and a panel of this Court reversed and remanded. *McNair*, 494 F.3d 771. The Forest Service sought review *en banc*, which was granted. The *en banc* panel affirmed the denial of a preliminary injunction.

*McNair*, 537 F.3d 981.  The *en banc* panel overruled *Ecology Center, Inc. v. Austin*, 430 F.3d 1057 (9th Cir. 2005), which had required the Forest Service to "'demonstrate the reliability of its scientific methodology'" or the hypotheses underlying the Service's methodology with "'on the ground analysis.'" *McNair*, 537 F.3d at 990, *citing Ecology Center*, 430 F.3d at 1064.   According to the *en banc* panel, this constituted "a requirement not found in any relevant statute or regulation," and "defied well-established law concerning the deference we owe to agencies and their methodological choices," particularly "when the agency is making predictions, within its [area of] special expertise, at the frontiers of science."  *McNair*, 537 F.3d at 991, 993 (internal citations and quotations omitted).

Applying a deferential standard, the *McNair* Court rejected Lands Council's argument that the Forest Service violated NFMA by failing to demonstrate the reliability of the scientific methodology underlying its analysis of the Project's effect on wildlife, specifically the flammulated owl and its habitat.  This Court reiterated the holding of prior cases that the Forest Service may use "the amount of suitable habitat for a particular species as a proxy for the viability of that species" (the "habitat as proxy" approach), and may also "use habitat as a proxy to measure a species' population, and then to use that species' population as a proxy for the population of other species (proxy on proxy approach).  *Id.* at 996-997 and n.10. With respect to the flammulated owl, this Court found it "eminently reasonable"

14

that the Forest Service concluded "that the Project will maintain a viable

population of flammulated owls because it will not decrease suitable flammulated

owl habitat in the short-term and will promote the long-term viability of suitable

flammulated owl habitat." *Id.* This Court therefore found that the district court

"did not abuse its discretion in deciding that Lands Council is not likely to succeed

on this aspect of its NFMA claim." *Id.* at 999.

This Court also held that "[t]he Forest Service has shown that it has

complied with Standard 10(b), and Lands Council's contentions to the contrary are

not supported by reliable evidence." *Id.* This Court noted that the Forest Service

had relied on two independent monitoring tools to determine the percentage of old

growth in the IPNF, the National Forest Inventory and Analysis ("FIA") and the

Timber Stand Management Record System ("TSMRS") database, both of which

determined that more than 11% of the IPNF is old growth. Lands Council

submitted a study that disputed that finding, but the Forest Service's expert had

found Lands Council's study not credible. As this Court noted, "[w]hen specialists

express conflicting views, an agency must have discretion to rely on the reasonable

opinions of its own qualified experts even if, as an original matter, a court might

find contrary views more persuasive." *Id.* at 1000 (*citing Marsh*, 490 U.S. at 378).

Thus, this court concluded that the Forest Service did not act arbitrarily or

capriciously in "relying on its own data and discounting the alternative evidence

offered by Lands Council." *Id.* (internal quotations and citation omitted). This Court also noted that no old growth will be cut as part of the Mission Brush Project, and therefore "it cannot be said that the Project itself violates the IPNF Plan's requirement to maintain ten percent of the forest acreage as old growth forest." *Id.*

This Court affirmed the district court's denial of a preliminary injunction, concluding that Lands Council was not likely to succeed on the merits of its NFMA or NEPA claims, and that it had not shown that, if the Court were to allow the Forest Service to proceed with the Mission Brush Project, that the balance of hardships tipped sharply in its favor. *Id.* at 1005-1006.

### 3. <u>The Summary Judgment Ruling.</u>

While the case was pending in this Court, the parties briefed cross motions for summary judgment, and after the *en banc* ruling issued, the district court granted summary judgment to the Forest Service. ER1. The court concluded that the FIA and the TSMRS database reliably showed that more than 10% of the IPNF is old growth, as required by the IPNF Plan. The court noted that the FIA uses "sample design and data collection standards that are strictly controlled, scientific, publicly disclosed, repeatable, and unbiased." ER11. The court rejected Lands Council's argument that the FIA is unreliable because its spot surveys were smaller than 25 acres, noting that nothing in the IPNF sets forth a minimum size

requirement for old growth stands.  ER12.  The district court also found

unpersuasive Lands Council's argument that a slight percentage variation between

the amount of old growth surveyed in 2004 and 2006 rendered the FIA's

conclusions unreliable, explaining that the FIA model is "well documented,

independent, public, and its findings are supported by other scientific materials in

the administrative record."  ER13.  Moreover, the court noted, the Forest Service

was entitled to deference where, as here, it had "reache[d] its decision based on its

experts' review of the facts, has considered the relevant factors, and has articulated

its reasoning."  *Id.*

The district court also held that the Forest Service did not act arbitrarily or

capriciously in relying on the TSMRS database.  The Forest Service had updated

the data regarding old growth in the Project area in light of *Powell*, the district

court noted, using new field studies verifying old growth quantities in the Project

area "and assur[ing] itself that the data it was relying on was accurate and timely."

ER14.  The court determined that the Forest Service had "discussed the

methodologies used to inventory and monitor old growth . . . such that it is

apparent that the models utilized reliable data in arriving at its conclusions.  The

administrative record further supports this conclusion with several current reports

and analysis which support the USFS's conclusions regarding the impact of the

proposed project on the old growth stands in the area."  ER14-15.

The district court concluded that "the models corroborate one another and support the USFS's position that the Project is in accordance with the IPNF requirement to maintain 10 percent minimum old growth. . . . Further, the USFS' updates of its data regarding old growth in the project lend weight to the reliability of the models as well as their conclusions that IPNF plan requirements for old growth are satisfied." ER16.

The district court rejected Lands Council's NEPA claims, holding that the Forest Service "took a hard look at the different forest management options' impact on old growth, fragmentation, and biological diversity." ER25. The Forest Service also took a hard look at past impacts on the Project area, including previous logging and fire suppression efforts, and its proposed treatments in old growth stands have "scientific support in the administrative record," the court noted. ER23. The court further concluded that the Forest Service had compiled site-specific data on restoration of old-growth forests and considered several studies before choosing the selected alternative. The court thus found that the Forest Service had satisfied NEPA and complied with the requirements of NFMA. ER34. The court noted that, contrary to Lands Council's arguments, the Project would not reduce allocated old growth, but instead would help recover old growth habitat by removing small-diameter trees. ER21.

The district court also rejected Lands Council's argument that the Project would violate the Forest Service's obligation to maintain habitat of sensitive species to prevent declines in population and protect species diversity, or the Forest Service's duty to evaluate project alternatives in terms of its impact on management indicator species' habitat and population. The district court found that the Forest Service complied with these obligations by assuring that sufficient old growth habitat will be maintained for both sensitive and management indicator species. The court noted that the use of habitat as a proxy for the well-being of species dependent on that habitat was specifically approved in *McNair*, as long as the methodology is sound. And the district court concluded that the Forest Service's methodology was sound in this case, that the databases relied upon by the Forest Service were reliable and corroborated one another's conclusions, and that the Forest Service had conducted its own field studies to update its data. ER28. The court thus found that the Forest Service "has described the quantity and quality of the habitat necessary to sustain the viability of the species, and explain[ed] its methodology for measuring the habitat." The court concluded that "[t]he models, databases, and materials relied upon by the USFS are timely, reliable, and supported by scientific reports." ER28. Accordingly, the district court found "no clear error of judgment in the USFS's analysis." *Id.*

The district court also determined that the Forest Service adequately considered the Project's impact on habitat for sensitive and management indicator species including the flammulated owl, northern goshawk, black-backed woodpecker, pileated woodpecker, fisher, marten and boreal toad. ER30-34.

## SUMMARY OF ARGUMENT

In deciding to remove understory trees and ladder fuels from old growth forest as part of the Mission Brush Project, the Forest Service took into account that some biologists believe that old growth should be left alone, but the Forest Service concluded, based on scientific evidence, that the failure to take the actions called for under the Project would have devastating effects on old growth forest and the viability of old growth associated species. Indeed, the SFEIS estimates that if no action were taken over the next 50 years, the amount of old growth in the Project area would drop drastically, while young, dense forests susceptible to drought, disease, insect infestation, and intense, stand-replacing fires would increase dramatically. ER258. The Forest Supervisor therefore concluded that "[b]ased on scientific evidence presented in the SFEIS (p.4-29) it is clear to me that maintaining dry forest old growth through no action is not a viable long-term management strategy." ER327.

The Project will not violate the IPNF Plan's requirement to maintain 10% of the Forest as old growth for the simple reason that, as this Court determined in

*McNair*, 537 F.3d at 1000, "no old growth forest is to be harvested under the Project." Furthermore, Lands Council failed to exhaust or waived most of its arguments regarding the Forest Service's methodology for determining the amount of old growth on the IPNF, and these claims are not subject to judicial review.

Nevertheless, as this Court held in *McNair*, 537 F.3d at 1000, the Forest Service did not act arbitrarily or capriciously in relying on the FIA and the TSMRS database to measure the amount of old growth on the Forest. The Forest Service has a high degree of confidence in the accuracy of the FIA at the forest-wide scale, and its results were corroborated by the TSMRS data, which the Forest Service updated in a comprehensive review of old growth stands on the Project area in 2005.

Lands Council's arguments that the 10% standard is insufficient to sustain old growth dependent species are not subject to judicial review, because Lands Council failed to exhaust the first argument, and failed to raise the second in the district court. Regardless, Lands Council offers no scientific support for its claim that the proper level of old growth is 14% rather than 10%, and this Court in *Ecology Center v. Castaneda*, 574 F.3d 652, 659 (9th Cir. 2009), rejected Lands Council's argument that the Lesica study establishes that the 10% old growth standard will result in the extirpation of some species.

The record makes clear that the Forest Service fully examined the effect of the Project on sensitive and management indicator species and applied relevant Forest Plan standards and regulatory requirements. The Forest Service's conclusion that the Project would not impact the viability of these species was grounded in the best available science and is entitled to deference.

The Forest Service properly relied on habitat as a proxy for the viability of management indicator and sensitive species, and it was not required to do on-the-ground surveys, as *McNair* made clear. The fact that flammulated owls were not found in some surveys in the Project area does not imply "anything about the impact of the proposed Project on flammulated owls." *McNair*, 537 F.3d at 995 n.8. Lands Council also ignores the fact that flammulated owls were found in other studies and surveys in old growth areas post-treatment. Northern goshawk were consistently found in surveys in the Project area from 2000 to 2005, contrary to Lands Council's contention, and Lands Council presents nothing to undermine the Forest Service's conclusion that the Mission Brush Project will not impair the viability of northern goshawk, or any of the other sensitive or management indicator species at issue.

Finally, the Forest Service's analysis of the Project's impact on the fisher was sufficient to meet the public disclosure requirements of NEPA. The Forest Service's analysis of the fisher's habitat needs and the Project's impacts on the

fisher spans nearly six pages of the SFEIS, in which the Forest Service took a hard

look at the fisher's habitat needs, the characteristics of the suitable habitat in the

Project area, and the likely effects of Project activities in that habitat.  ER252-253,

291-295.

## STANDARD OF REVIEW

This Court reviews a grant of summary judgment *de novo*, using the same

standard of review as the trial court.  *Swanson v. United States Forest Service*, 87

F.3d 339, 343 (9th Cir. 1996).  This Court reviews agency action under NFMA and

NEPA pursuant to the standards set forth in the APA.  *Kootenai Tribe of Idaho v.

Veneman*, 313 F.3d 1094, 1114 n.14 (9th Cir. 2002); *Wetlands Action Network v.

U.S. Army Corps of Engineers,* 222 F.3d 1105, 1114 (9th Cir. 2000).  The APA

provides for review of agency action to determine whether it is "arbitrary,

capricious, an abuse of discretion, or otherwise not in accordance with law."

5 U.S.C. § 706(2)(A).   Agency action is valid if there is a reasonable basis for it; a

reasonable basis exists where the agency considered the relevant factors and

articulated a rational connection between the facts found and the choices made.

 *Arrington v. Daniels*, 516 F.3d 1106, 1112 (9th Cir. 2008).  A court may "uphold a

decision of less than ideal clarity if the agency's path may reasonably be

discerned," *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S.

29, 44 (1983), but review is confined to the administrative record.  *Id.* at 50.  Like

the "substantial evidence" test for review on the record of agency hearings, the "arbitrary or capricious" standard is akin to, if not more deferential than, the "clearly erroneous" test for appellate court review of trial court decisions. *See Dickinson v. Zurko*, 527 U.S. 150, 162–63, 164 (1999).

This Court thus explained in *Lands Council v. McNair* that "as non-scientists, we decline to impose bright-line rules on the Forest Service regarding particular means that it must take in every case to show us that it has met NFMA's requirements." *McNair*, 537 F.3d at 993-994. Rather, this Court "will conclude that the Forest Service acts arbitrarily and capriciously only when the record plainly demonstrates that the Forest Service made a clear error of judgment in concluding that a project meets the requirements of the NFMA and relevant Forest Plan." *Id.*

In the context of the procedural requirements imposed by NEPA, "[t]he arbitrary and capricious standard requires a court to ensure that an agency has taken the requisite hard look at the environmental consequences of its proposed action, carefully reviewing the record to ascertain whether the agency decision is founded on a reasoned evaluation of the relevant factors." *Wetlands Action Network*, 222 F.3d at 1114 (internal quotations and citation omitted). When reviewing agency determinations made in the course of complying with NEPA, this Court has stated that, "[w]e review an EIS under a rule of reason to determine

whether it contains a reasonably thorough discussion of probable environmental

consequences. * * * In our review, we must not substitute our judgment for that of

the agency." *Selkirk Conservation Alliance v. Forsgren*, 336 F.3d 944, 958 (9th

Cir. 2003) (internal quotations and citation omitted).

## ARGUMENT

## I.    THE FOREST SERVICE IS IN COMPLIANCE WITH THE IPNF PLAN REQUIREMENT TO MAINTAIN 10% OF THE FOREST AS OLD GROWTH.

The IPNF Plan establishes "standards for old growth maintenance," and

states that "[a]pproximately 10 percent of the Forest will be maintained in old

growth as needed to provide for viable populations of old-growth dependent and

management indicator species."  ER40.  The Plan also provides that "[e]xisting old

growth stands may be harvested when there is more than 5 percent in an old-

growth unit, and the Forest total is more than 10 percent."  ER43.

### A.    No Old Growth Will Be Harvested As Part of the Mission Brush Project.

Lands Council's argument that the "277 acres of old-growth timber harvest

approved in the Mission Brush Project" violates the prohibition on harvesting old

growth if the Forest is less than 10% old growth (LCBr. 26) fails for the simple

reason that old growth will not be harvested.  Rather, only smaller, understory trees

and ladder fuels are to be removed.  The ROD states that "the proposed treatments

in dry forest old growth are focused on removing the smaller diameter trees (mostly Douglas-fir) while maintaining the old growth ponderosa pine and western larch legacies." ER327.  As the *en banc* panel stated in *McNair*, 537 F.3d at 1000, "[t]he Forest Service has . . . established that it will not harvest any old-growth trees as a part of the Project."  The Court continued, "In *Lands Council I*, we held that 'because no old growth forest is to be harvested under the Project, . . . it cannot be said that the Project itself violates the IPNF Plans' requirement to maintain ten percent of the forest acreage as old growth forest .' . . . [W]e reach the same holding here." *Id.*  The District Court noted that Lands Council was "tak[ing] the Project's proposed actions out of context," and it explained that "[t]he treatments prescribed by the Project will include harvesting of trees contained within old growth stands in order to achieve a more historical and sustainable old growth stand.  These treatments are designed to increase and maintain existing old growth stands and 'allocat[e] additional stands for future old growth as they mature.'" ER21.  Indeed, the record makes clear that "[t]he IPNF does <u>not</u> do timber harvest that removes allocated old growth stands.  We ceased regeneration harvest of allocated old growth stands a number of years ago." ER151.  In the Mission Brush ROD, the Forest Supervisor concluded that "[n]one of the treatments will result in a net loss of allocated old growth, consequently Forest Plan standards for old growth maintenance and distribution will continue to be met." ER330; *see also*

ER272-273.

**B.      The Forest Service's Conclusion That More Than 10% Of The IPNF Is Old Growth Is Entitled To Deference.**

Even if the Mission Brush Project would have an effect on the amount of old growth in the IPNF, which it will not, the record in this case fully supports the Forest Service's conclusion that more than 10% of the IPNF is old growth.  The two inventories relied upon by the Forest Service, the FIA and the TSMRS database, used different sample designs and were performed by different individuals.  In 2004, both inventories concluded that the IPNF had more than 11% old growth.  As this Court in *McNair* and the district court concluded, the Forest Service's reliance on the FIA and the TSMRS database  was not arbitrary or capricious.

**1.  The FIA.**  The administrative record contains detailed information regarding the TSMRS and the FIA.  ER148-164.  The first of these tools, the FIA, is a congressionally mandated, statistically based, continuous inventory of the forest resources of the United States.  ER148.  Since 1930, the FIA program has been administered through the Research Branch of the Forest Service, which is administratively independent of the National Forest System.  *Id.*  The sample design and data collection methods for the FIA are scientifically designed, publically disclosed, and repeatable.  Data collection protocols are publicly

27

available on the internet.  There are stringent quality control standards and

procedures designed to ensure that there is no bias in sample design, plot location,

trees selected for measurement, or the measurements themselves.  *Id.*

The FIA does not provide a "100% annual census of every tree on every acre

in a national forest.  With approximately 2,500,000 acres on the IPNF alone, and

hundreds to thousands of trees per acre, that would not be possible."  ER148.

Rather, the FIA's results are "a statistically sound representative sample designed

to provide unbiased estimates of forest conditions at large and medium scales."  *Id.*

Because the FIA data come from a statistically valid sample rather than a 100%

census, the estimates are computed and reported as point estimates with confidence

limits.  The IPNF uses a 90% confidence interval for old growth estimates.  *Id..*

Based on FIA data, the estimated percent of old growth on the forested lands of the

IPNF as of 2004 was 12.85%, with a 90% degree of certainty.  ER149.


Lands Council takes issue with the fact that the FIA database measures old

growth in sample plots that are one sixth of an acre, contending that only stands

greater than 25 acres in size may be considered old growth, and that therefore the

FIA cannot provide adequate information regarding the "quality of old growth

timber stands."  LCBr. 17, 51-52.  This argument is without merit.

First, as the Forest Service's Appeal Reviewing Officer ("ARO")  explained

in the administrative appeal recommendation, the Forest Service does not rely on the FIA for information regarding "block size, spatial relationships, nor integrity of old growth habitat." ER366. This information is gathered "when the stand level allocation and verification is done" as part of the TSMRS reviews. *Id.* The ARO explained that "[s]ince forests are not static the IPNF takes a closer look at old growth stands within a project area when a management activity is being considered that could possibly impact old growth. This information is used to update the [TSMRS] inventory." *Id.*

Second, contrary to Lands Council's suggestion, the IPNF Plan does not state that stands less than 25 acres in size cannot be counted towards the 10% forest wide standard, or that there is any prohibition on such stands being considered as old growth. Lands Council cites to the IPNF Plan EIS, which states that the "minimum size of an area that can be considered old growth is 25 acres," (LCBr. 51, ER91), but the EIS is not the controlling decision document; the IPNF Plan is. IPNF Plan section 10(f), which is in the "Objectives" section of the Plan, states that "one or more old-growth stands per old-growth unit should be 300 acres or larger. . . . The remaining old-growth management stands should be at least 25 acres in size. Preferred size is 80 plus acres." ER43. The IPNF Plan thus makes clear that for planning purposes, the Forest Service should aim for old growth stands of at least 25 acres, but it does not suggest that stands below the desirable

size do not constitute old growth. As the district court explained, section 10(f) reflects the plan's preference for larger old growth stands, not a minimum size requirement for old growth stands. ER13.

In examining a similar provision regarding the size of old growth units in the Kootenai National Forest Plan, this Court in *Ecology Center*, 574 F.3d at 660-661, stated that "[w]e cannot conclude that this language creates a mandatory rule that strictly limits designation of old growth to blocks larger than 50 acres." Rather, this Court explained, "[t]he section is cast in suggestive (i.e., "should" and "may") rather than mandatory (e.g., "must" or "only") terms. . . . It suggests how old growth should be managed, not how it must be designated." *Id.* at 661; *see also Wilderness Society v. Bosworth*, 118 F.Supp.2d 1082, 1096 (D. Mont. 2000) ("the 25-acre minimum size requirement in the [Clearwater] Forest Plan is a guideline and is therefore discretionary rather than mandatory." The IPNF Plan uses similarly aspirational language, and does not state that areas less than 25 acres may not be considered old growth. ER43.

The SFEIS addressed the issue of the size of old growth stands in the Project area, and stated that there were seven stands within the Project old growth management units that were less than 25 acres, "but these stands are generally less than a quarter-mile from other larger patches of old growth." ER273. Moreover, even if these smaller stands were not considered as part of the allocation, there

would still be enough old growth in the Project area to meet the old growth

standard.  *Id.*

Lands Council's complaint that the Forest Service has not included the FIA

or the TSMRS data in the record is simply incorrect.  LCBr. 16.  As the Appeal

Reviewing Officer made clear, the FIA data is available to the public at

http://fia.fs.fed.us/tools-data.  ER 366.

Lands Council contends that the FIA is not statistically significant, arguing

that the total acreage studied on the IPNF amounted to 8.3 acres.  LCBr. 17, 53.

Lands Council failed to raise this argument in the administrative appeal, and

therefore it is not subject to judicial review.  The APA requires that plaintiffs

exhaust administrative remedies before filing suit in federal court.  5 U.S.C. § 704;

*Buckingham v. Secretary, U.S. Dep't of Agriculture*, 2010 WL 1712487 at *5 (9th

Cir. 2010).  This requirement applies to claims against the Forest Service. 7 U.S.C.

§ 6912(e); *see also* 36 C.F.R. § 251.101 (requiring exhaustion of Forest Service

procedures prior to filing suit in court).  As this Court has explained,

> The purpose of the exhaustion doctrine is to allow the administrative
> agency in question to exercise its expertise over the subject matter and
> to permit the agency an opportunity to correct any mistakes that may
> have occurred during the proceeding, thus avoiding the unnecessary or
> premature judicial intervention into the administrative process.

*Buckingham*, 2010 WL 1712487 at *5.  Lands Council's failure to raise this issue

in the administrative appeal deprived the agency of notice of, and an opportunity to

"bring its expertise to bear to resolve" Lands Council's claim. *See Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 900 (9th Cir. 2002). "Since the Forest Service was not given notice of this claim sufficient to allow it to resolve the claim, the claim was not properly exhausted and is not subject to judicial review." *Idaho Sporting Congress, Inc. v. Rittenhouse*, 305 F.3d 957, 965 (9th Cir. 2002).

Lands Council also failed to raise the argument in the district court, and therefore it is also waived. *Cold Mountain v. Garber*, 375 F.3d 884, 891 (9th Cir. 2004) ("[i]n general, we do not consider an issue raised for the first time on appeal"). This Court recognizes three narrow exceptions to the rule against considering issues not raised in the district court" (1) where "review is necessary to prevent a miscarriage of justice or to preserve the integrity of the judicial process," (2) when "a new issue arises while appeal is pending because of a change in the law," or (3) when the issue presented is purely one of law and either does not depend on the factual record developed below, or the pertinent record has been fully developed." *Id.* at 891. Even if Lands Council had exhausted its administrative remedies, which it has not, none of the exceptions to waiver apply in this instance: there will be no miscarriage of justice or threat to the integrity of the judicial process if this Court does not consider the issue; there has been no change in the law, and the issue is not purely one of law. *See id.* This Court

should therefore decline to consider Lands Council's argument.

Regardless, Lands Council offers no scientific support for its bare-bones assertion that the FIA's sampling is not statistically significant. The Forest Service concluded to the contrary, and Lands Council offers nothing to cast doubt on the Forest Service's conclusion that the FIA sample design and data collection are a statistically sound and scientifically valid process for measuring forests at large and medium scales. ER148. The validity of using the FIA data to estimate old growth at a national forest scale was assessed by Czaplewski (2004), a Ph.D senior research mathematical statistician working for the Forest Service Rocky Mountain Research Station in Ft. Collins, Colorado. Czaplewski concluded that FIA data "can produce a scientifically defensible estimate of the proportion of forest within a National Forest that meets the Northern Region's definition of old growth." ER161. The district court determined that the FIA "utilizes sample design and data collection standards that are strictly controlled, scientific, publicly disclosed, repeatable, and unbiased." ER11. As the district court correctly concluded, the Forest Service's determination that the FIA database was reliable is entitled to substantial deference "when, as here, it reaches its decision based on its experts' review of the facts, has considered the relevant factors, and has articulated its reasoning." ER13.

This Court should also decline to consider Lands Council's argument that

the FIA is unreliable, as allegedly shown by a discrepancy between the amount of old growth found in 2004 and that found in 2006. *See* LCBr. 52. The 2006 data was published in July 2006, after the ROD issued and after Lands Council filed its administrative appeal. The decision under review in this proceeding is the Forest Supervisor's ROD, issued in April 2006. A report issued in July 2006 cannot serve to render that determination arbitrary and capricious. *See Southwest Center For Biological Diversity v. United States Forest Service*, 100 F.3d 1443, 1450-51 (9th Cir. 1996) ("[j]udicial review . . . typically focuses on the administrative record in existence at the time of the decision"). The 2006 Monitoring Report was included in the record because it was issued before the final decision on the administrative appeal, but it was not "in existence at the time of" the Forest Supervisor's decision to issue the ROD, and cannot form the basis for an attack on the April 2006 ROD.

However, the fact that in 2004, the estimated percent of old growth on the IPNF based on FIA data was 12.85%, with 90% confidence intervals between 10.55% and 15.27%, and in 2006, the estimate was 11.8%, with 90% confidence intervals of 9.5% to 14%, does not mean that the FIA is unreliable or that the Forest Service is not in compliance with standard 10(b) of the IPNF Plan. As the district court stated, "the slight percentage variation between the years 2004 and 2006 does not render the FIA unreliable." ER13. The state of any forest is dynamic, not static, and the fact that inventories vary slightly from year to year

does not establish that an earlier estimate was inaccurate at the time. And the fact that the lower end of the confidence interval in the 2006 estimate is below 10% does not mean that the Forest Service is not in compliance with IPNF Plan standard 10(b). Lands Council overstates the significance of the confidence interval, which demonstrates that there is only a 5% chance that the amount of old growth on the IPNF is less than 9.5%, and a 95% chance that there is more than 9.5% old growth. There is also a 50% chance that the amount of old growth is greater than 11.8%. The best estimate of the FIA is that the amount of old growth in 2006 was 11.8%.

      **2. The TSMRS.** The second analytical tool that the Forest Service used to determine compliance with IPNF Plan standard 10(b) is the IPNF stand-level old growth inventory, which is recorded in the Timber Stand Management Record System (TSMRS) database. The "stand-level old growth map represents of census of those stands allocated for old growth to meet forest plan standards." ER150. Information on forest stands "is gathered by ranger district personnel." *Id.* Over 98.5% of stands on the IPNF were allocated based on a field examination. Most stands are "examined with a systematic grid of plots that counts and measures trees on these plots." A smaller number "were allocated to old growth based on notes and measurements from . . . walk-thru, field verification surveys by foresters and forestry technicians knowledgeable about old growth definitions." Less than 1.5% of old growth stands were allocated "from photo inventory, and all

of those will be field verified before any forest management projects are carried out in those watersheds." *Id.* The 2004 TSMRS database showed that 10.7% of the IPNF was old growth. ER153.

Because the IPNF has roughly 6,500 individual old growth stands distributed across 2.5 million acres of forest, it is not possible for the Forest Service to visit every old growth stand every year. ER151. The Forest Service acknowledges that "[b]ecause natural changes are going on continually (this includes both disturbances that remove old growth, and other stands maturing into old growth)," some of the TSMRS information may be outdated at any given time." *Id.*. However, "to ensure that all management actions are designed based upon current old growth conditions," the Forest Service takes a "closer look at old growth allocations within a project area whenever any management activity is being considered that could possibly impact old growth." *Id.*

From 1990 to 1993, the IPNF did a forest-wide inventory of old-growth resources. ER150. Then, "[s]tarting in 2001 the Idaho Panhandle National Forest began a comprehensive review of old growth data, and did some new field reviews and exams, to incorporate changes in conditions on the ground." *Id.* In 2005, as part of the Mission Brush Project analysis, the Forest Service conducted an exhaustive validation of the TSMRS data for the Project area, which contained two old growth management units. ER167. First , the Forest Service reviewed all

36

stands that were "allocated," or being managed, as old growth, to determine if they do indeed meet standards. "Allocated old growth" includes existing old growth, that is, stands that meet all old growth criteria ("code 9") and stands of potential old growth, which are areas that lack some old growth criteria, but meet others and are expected to meet all criteria in time ("code 11"). *Id.* Each stand that was reviewed was measured against the widely accepted standards for old growth set forth in *Green et al.* (1992). *See* ER128. The date of the latest exam was noted and any significant disturbances that could have changed the character of the stands were noted. All stands coded as old growth or potential old growth "with a harvest activity code in the database *since* the most current stand exam" or in an area where wildfire or insect or disease outbreaks could have potentially changed the condition of the stands were removed from the old growth allocation until a more current stand exam was completed. ER167. "If a new exam determines that the stand still meets the IPNF's old growth standards the stand [was] placed back in the District's allocation." *Id.* The administrative record includes a table with the date of each stand exam and the rationale for either including or excluding it from the old growth allocation. SER196-206.

Lands Council raises several challenges to the Forest Service's use of the TSMRS database (LCBr. 43-50), all of which it failed to exhaust. Lands Council's only challenge to the TSMRS in its administrative appeal was the contention that

its own expert's report (upon which Lands Council does not rely in this appeal) "reveals the IPNF's old-growth inventory inaccurately inflates the actual amount of old growth existing on the Forest." ER341. This Court therefore should decline to consider the challenges Lands Council raises now. *See* SER346-415; *Buckingham,* 2010 WL 1712487 at *5; *see also Lands Council v. McNair*, 537 F.3d at 999 n.12 (noting that Lands Council did not contest the reliability of the TSMRS database until oral argument before the *en banc* panel).

In any event, Lands Council's challenges to the Forest Service's use of the TSMRS database are unavailing. Lands Council argues that the Forest Service's use of the TSMRS is effectively forbidden by *Powell*, but this Court held that the Forest Service's reliance on the TSMRS database to demonstrate compliance with the 10% old growth standard was not arbitrary or capricious. *McNair,* 537 F.3d at 999 and n.12. In *McNair*, This Court explained that the Forest Service had substantially updated the TSMRS database as a result of *Powell*, and it did not act arbitrarily or capriciously in relying on the data it gathered. The district court pointed out that "the USFS completed the SFEIS specifically for the purpose of updating its data regarding old growth in the Project area because of the *Powell* decision," and it concluded that "the USFS' updates of its data regarding old growth in the project lend weight to the reliability of the models as well as their

conclusions that the IPNF Plan requirements for old growth are satisfied." ER16.

Moreover, as both this Court and the district court determined, the FIA provides an independent, scientifically valid estimate of old growth that affirms the estimates from the TSMRS. *Lands Council v. McNair*, 537 F.3d at 999; ER16.

Lands Council failed to exhaust its claim regarding the sufficiency of the TSMRS update (LCBr. 9-10, 43-44), and this Court should decline to consider Lands Council's challenges now. *Buckingham*, 2010 WL 1712487 at *5. Regardless, as discussed above, the Forest Service conducted a thorough review of all old growth in the Project area. ER212, 167. Lands Council complains that the Forest Service visited only 21 of the 74 old growth stands in the Project Area. LCBr. 13, *citing* ER169-175. Lands Council's figures are off, in part because the document it cites is incomplete. In 2005, the Forest Service reviewed a total of 64 old growth stands, and out of those it visited 24. SER196-206. The number of stands reviewed is immaterial, however, because the record clearly explains the Forest Service's reasoning in deciding which stands to visit: it field reviewed all stands for which it had reason to think the designation, based on a prior field review, might have changed. ER167.

Lands Council also failed to exhaust its argument that the administrative record does not contain enough information regarding the review of old growth

forest-wide that began in 2001, (*see* LCBr. 8, 43) but any shortfall is a result of Lands Council's failure to raise these issues in the administrative appeal.  In the administrative appeal, Lands Council complained that field notes and surveys had not been made available in response to litigation from 1999-2001, but it did not suggest that inadequate information was available regarding the Forest Service's updates to the TSMRS starting in 2001.  *See* ER341-342.  This claim therefore is not subject to review.

The record nevertheless makes clear that the "actual stand data that's the basis of the old growth determination is found in stand exam data stored in the FSVEG database, and other information an field notes in the individual stand folders."  ER152.  The TSMRS data can be found on the IPNF website, http://www.fs.fed.us/ipnf/, by following links to Land and Resources Management and then Geospatial data.  What is more, Lands Council has requested, and received, the entire TSMRS database in response to Freedom of Information Act requests.

Lands Council is wrong to complain (LCBr. 45) that the record does not contain information on snag density and canopy closure.   Lands Council ignores the fact that canopy closure estimates and snag data are not primary elements in the determination of old growth as defined in Green (2005), which is the established

standard for defining old growth followed by the Forest Service. Green explains that "attributes such as decadence, dead trees, the number of canopy layers and canopy gaps are important but more difficult to describe because of high variability." ER133. Because of this, these attributes are considered "associated characteristics" and not "minimum criteria." ER134. Nevertheless, the FIA provides accurate forest-wide snag data. On the whole, the IPNF has 10.4 snags per acre that are between 10 and 19 inches in diameter. ER143. Canopy cover is a stand-specific criteria, and is relevant to the habitat needs of some species, such as northern goshawk. *See e.g.,* ER285. As part of project level analyses, as here, the Forest Service therefore reviews canopy cover in conjunction with examining suitable habitat for species. *Id.* (noting that goshawks prefer "high canopy closure punctuated by occasional small openings," and stating that between 2001 and 2006, Forest Service personnel conducted site visits of 155 discrete stands totaling approximately 5,334 acres of capable goshawk habitat for model validation. Some areas were rejected as unsuitable because of open-canopied structure).

Lands Council also failed to exhaust its claim that the 10% minimum old growth standard is not met, because there was a 22% deflation in the percentage of allocated code 9 old growth in the Project area as a result of the 2005 review. LCBr. 13-14. Lands Council maintains that the decrease in the Mission Brush

Project area would likely apply forest-wide and that it is therefore clear that the Forest Service is not complying with the IPNF Plan standard 10(b). LCBr. 48-50. Again, this Court should not consider this claim, which was not raised before the Forest Service in the first instance.

Lands Council's conclusion, however, does not follow. The fact that old growth decreased in one area of the IPNF does not mean that it necessarily decreased by that same amount elsewhere. What the decline does demonstrate, however, is the need to take the action to protect old growth threatened by insects, disease and overcrowding. As the Forest Supervisor noted in the ROD, the greatest threat to old growth on the IPNF is no action. ER327.

Lands Council's suggestion that the Forest Service substituted potential old growth for actual old growth in order to meet the 10% standard is misleading. Lands Council ignores the fact that in the 2004 Monitoring Report the Forest Service concluded that even excluding areas of potential old growth, the IPNF has 247,060 acres of old growth, which equals 10.7% of the forest. ER153. And the record clearly explains why the Forest Service maps and includes potential old growth in the TSMRS inventory. ER152. The Forest Service does this because the potential old growth, while lacking in some characteristics of old growth, does meet, or come close to meeting, a number of old growth minimum criteria, and contributes to old growth functions in some areas and at some scale. With time,

areas designated potential old growth are expected to meet all old growth criteria. As the Forest Service explained, "this is consistent with the direction in *Green and others (2005)* about the importance of using landscape ecology considerations, as well as individual stand attributes, in selecting land to be allocated as old growth." ER152.

Lands Council also misleadingly suggests (LCBr. 48) that the district court in *Lands Council v. Vaught*, 198 F. Supp. 2d 1211 (E.D. Wash. 2002) concluded that the TSMRS overestimated old growth by 32-56% in the IPNF. This statement was the court's reiteration of Lands Council's position, not the court's holding. The court held that the project failed to show consistency with the forest-wide old growth standard, not because of Lands Council's assertion but because "no citation to the administrative record is provided." *Id.* at 1224. By contrast, here the SFEIS provides extensive discussion of the data upon which Forest Plan consistency is based.

## II.     LANDS COUNCIL FAILED TO EXHAUST AND WAIVED ITS CHALLENGES TO THE 10% OLD GROWTH STANDARD.

This Court should not consider Lands Council's challenges the sufficiency of the 10% old growth standard to protect old-growth dependent species, because Lands Council failed to exhaust its administrative remedies with respect to its first argument, and failed to raise the second argument in the district court.

Lands Council argued for the first time on summary judgment that the Forest Service is required to maintain 14% old growth in the IPNF, rather than the 10% specified by the Plan.  LCBr. 32.  The IPNF Plan provides that "[h]abitat for vertebrate populations, other than threatened, endangered and sensitive species, will be managed to maintain viable populations (greater than 40% of maximum potential.").  ER40.  Lands Council reasons that because the Forest Service uses habitat levels as a proxy for population levels, then the IPNF Plan requirement to maintain greater than 40% of maximum population potential of vertebrate species means that the Forest Service must maintain at least 40% of the maximum habitat of those species.  LCBr. 32.  Because the percentage of old growth in the Project area historically ranged from 15% - 35%, Lands Council concludes, then 40 percent of the maximum habitat potential of 35% yields a minimum old growth habitat threshold of 14%.  LCBr. 22, 38, ER237.  Lands Council failed to exhaust its administrative remedies with respect to this claim, and therefore this Court should not consider it.  *Buckingham*, 2010 WL 1712487 at *5.  *See* SER346-415, 28-71.

Regardless, Lands Council's argument is not grounded in law or science.  As the district court correctly noted, "just because the Forest Service used the proxy habitat method, does not mean that the USFS is now required to meet a higher percentage of minimum old growth than expressly stated in the IPNF Plan's

standards." ER 29. The Forest Plan's goal of maintaining greater than 40% population potential is an objective, not a requirement, and is not legally enforceable. *See* ER 40; *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55, 71-72 (2004). Even if it were, Lands Council cites no scientific support for its assumption that 40% of population potential equates to 40% of maximum old growth. Most species, including old growth dependent species, utilize a variety of habitats, although they may be dependent upon a particular habitat component. For example, the northern goshawk, an old growth associated species, utilizes other habitats as well. ER 288. Nor does Lands Council provide any scientific authority for its conclusion that the historical maximum old growth habitat is significant in managing current populations of old growth dependent species. Finally, Lands Council ignores the fact that in the "geographically distinct portion of the IPNF" (*see* LCBr. 22) where the Mission Brush Project is located - that is, the North Zone, old growth levels are currently at 14%. ER237. Thus, even if Lands Council's novel mathematical exercise were an appropriate means of calculating species viability, the North Zone of the IPNF contains 14% old growth, and thus satisfies Lands Council's standard.

Lands Council has waived its arguments based on a study by Lesica, which estimates that 20% to 50% of low and mid elevation forests in Montana were in old growth state prior to European settlement. LCBr. 38-40. Lands Council claims

that Lesica makes clear that the IPNF Plan's 10% old growth requirement is too low and will result in the extirpation of some species, and also argues that the Forest Service improperly excluded the Lesica study from the record. *Id.* at 38-39. Lands Council did not raise these arguments regarding the Lesica study in its complaint or in its motion for summary judgment, and therefore they are waived.[2] *Cold Mountain,* 375 F.3d at 891 ("[i]n general, we do not consider an issue raised for the first time on appeal"); *see* SER4-71. None of the exceptions to the waiver doctrine applies here: there will be no miscarriage of justice or threat to the integrity of the judicial process if this Court does not consider the issue. *See id.* There has been no change in the law, and the issue is not purely one of law. Lands Council's argument therefore is waived.

Regardless, this Court has already rejected the Lesica study's relevance to the question of how much old growth is necessary to support old-growth dependent species. In *Ecology Center*, 574 F.3d at 659, this Court concluded that "Lesica's conclusion does not bear directly on the 'viable population' standard. The fact that levels of old-growth forest were significantly higher prior to European settlement

---

[2] Lands Council did state, in the final sentence of its argument in its district court brief, without citation or elaboration, that "new information from the FS itself conclusively shows that such a minimal level is not sufficient for insuring species viability or providing for biological diversity. Supra." LCBr. at 22. This is not a reference to the Lesica study and does not constitute preservation of the argument.

in no way disproves the conclusion that ten percent is enough to support 'viable populations.'" *Id.* The Court also explained that the agency need not respond to every comment or scientific study, and was not required to respond to the Lesica study because it did not "directly challenge the Forest Service's conclusion that 10% was sufficient to sustain viable populations of old growth species." *Id.* The Court in *Ecology Center* was addressing a challenge to the Kootenai National Forest Plan, but its reasoning applies equally well here.

## III. THE FOREST SERVICE'S CONCLUSION THAT THE PROJECT WILL NOT AFFECT THE VIABILITY OF MANAGEMENT INDICATOR AND SENSITIVE SPECIES IS ENTITLED TO DEFERENCE.

NFMA requires that Forest Plans "provide for diversity of plant and animal communities . . . in order to meet overall multiple-use objectives." 16 U.S.C. § 1604(g)(3)(B). The IPNF Plan requires the Forest Service to "[m]anage the habitat of species listed in the Regional Sensitive Species List to prevent further declines in populations which could lead to federal listing under the Endangered Species Act." ER42. The IPNF Plan also requires the Forest Service to monitor population trends of management indicator species, and evaluate each Project alternative in terms of the impact on both indicator species habitat and population. *Id.*

This Court explained in *McNair*, 537 F.3d at 992, that "neither the NFMA and its regulations nor the IPNF Forest Plan specify precisely how the Forest

Service must demonstrate that its site-specific plans adequately provide for wildlife viability . . . . Thus, we defer to the Forest Service as to what evidence is, or is not, necessary to support wildlife viability analyses." *McNair* did make clear, however, that the Forest Service may use "the amount of suitable habitat for a particular species as a proxy for the viability of that species" (the "habitat as proxy" approach), and may also "use habitat as a proxy to measure a species' population, and then to use that species' population as a proxy for the population of other species (proxy on proxy approach). *Id.* at 996-997 and n.10.

As part of the Project analysis, the Forest Service assessed the status and distribution of wildlife species "of concern within the project area," that could "potentially be affected by proposed activities." ER248. These included, among others, black-backed woodpecker, flammulated owl, northern goshawk, fisher, and western toad. *Id*. The Forest Service assessed both capable and suitable habitat in the Project area for each of these species,[3] as well as the quality and quantity of habitat necessary to support each species of concern. ER248, 250-255. The Forest Service based its conclusions on "scientific literature, wildlife databases, professional judgment, recent field surveys, and habitat evaluations." ER248. The Forest Service discussed its specific methodology and took steps to confirm

---

[3] Capable habitat "refers to the inherent potential of a site to produce essential habitat requirements of a species." ER248. Suitable habitat is "wildlife habitat that currently has both the fixed and variable stand attributes for a given species' habitat requirements." *Id.*

that its habitat models were reliable and accurate, conducting "site visits of representative capable habitat for the species, with emphasis placed on stands modeled as 'currently suitable.'" *Id.* A wildlife biologist or wildlife technician visited proposed treatment areas that potentially included suitable habitat for one or more species addressed in the model, unless those areas were "determined to be obviously suitable or unsuitable for modeled species based on field notes and unit descriptions provided by" the project leader. *Id.*

The Forest Service also carefully and thoroughly examined the direct, indirect and cumulative effects on the wildlife species of concern. ER248-257, 275-302. The Forest Service's assessment was supported by site specific field investigation and validation of habitat conditions, and the Forest Service described its conclusions and underlying methodology and scientific support in detail in the SFEIS. *See e.g.*, SER167, ER281, 285, 291. The SFEIS indicates how much suitable habitat is available for each of the analyzed species both before and after Project implementation. ER279, 282- 283, 286, 290, 292-294, 298-301. The Forest Service considered post-Project viability for each species including cumulative effects of past, ongoing and reasonably foreseeable activities, and concluded that the Project would not likely contribute towards Federal listing or cause a loss of viability for any of the examined species. ER281, 285, 291, 295.

The Record makes clear that the Forest Service fully examined the effect of

the Project on sensitive and management indicator species and applied relevant Forest Plan standards and regulatory requirements. The Forest Service's conclusions are reasonable and grounded in the best available science and are entitled to deference. As the district court correctly concluded, the Forest Service's conclusion, based on its discussion and analysis, that the Project was in compliance with the IPNF Plan requirements for maintaining old growth dependent species' population levels and the NFMA's monitoring requirements for indicator species "is well supported in the record," and its "decision and reliance on its site specific monitoring was not arbitrary or capricious." ER34 - 35.

Lands Council is wrong to argue that the Forest Service's conclusions were untenable because its habitat suitability models were based on flawed TSMRS data. LCBr. 54-56. For the reasons discussed above at pages 29-45, and as determined in *McNair*, 537 F.3d at 999-1000, both the TSMRS and FIA estimates are reliable. Moreover, with respect to the specifics of this Project, the Forest Service conducted site specific validity examinations of the units potentially affected to affirm the preliminary determinations of suitability made using the databases. *See e.g.* ER281, 285 (noting site visits to verify habitat suitability for flammulated owl and northern goshawk). The Forest Service habitat models are based on published scientific studies regarding the habitat needs for the species concerned. Field reviews confirmed that the habitat conditions preliminarily

identified through the TSMRS database were present on the ground. Lands Council's argument, therefore, is unavailing.

Lands Council is also incorrect to argue that the Forest Service's suitability model for flammulated owls is flawed because some surveys the Forest Service conducted from 1993 to 2000 did not confirm the presence of flammulated owl. LCBr. 55-58. This Court rejected Lands Council's argument outright in *McNair*, 537 F.3d at 995 n.8, stating that "we cannot infer from these studies anything about the impact of the proposed Project on flammulated owls." This Court has already decided the issue, and there is no reason to revisit it.

This Court held in *McNair*, 537 F.3d at 992, 994, that the Forest Service is not required to do ground surveys at all, and this Court defers to the Forest Service "as to what evidence is, or is not, necessary to support wildlife viability analyses." If the Forest Service does so, this Court recognized, "monitoring difficulties do not render a habitat-based analysis unreasonable, so long as the analysis uses all the scientific data currently available." *Id.* at 998. In this case, the Court noted that nesting boxes used may have been placed too low on the trees in some of the surveys, and that the Forest Service has represented that it is difficult to detect flammulated owls. *Id.* Nevertheless, as this Court recognized, the Forest Service did record the presence of flammulated owls in other surveys, in habitat that was treated with thinning and underburning in the mid-1970s, logged in 2000, and

underburned in 2002.  SER337-339; *see McNair*, 537 F.3d at 995.  Other studies in the administrative record determined that flammulated owls were using old growth habitat post-treatment.  *Id.* at 994-995, SER300-302, 308-311.

The record supports the Forest Service's determination that fire suppression has been a negative influence on flammulated owl habitat, and that thinning out dense understory in the 277 acres of old growth and restoring the role of fire to the ecosystem will be beneficial to old growth dependent species such as flammulated owls.  SER301, 322.  Sampson states that  "[w]hether enough fire can be introduced is unknown, and mechanical removal of understory, particularly in relatively large areas, may serve as an effective alternative to fire.  Size of area to be restored is important (larger is better) to slow subsequent peripheral encroachment of understory, particularly by shade tolerant tree species."   SER333.


Lands Council mischaracterizes the results of the goshawk surveys in the record in claiming that they met with "only limited success."  LCBr. 58.  The record reflects that within the Project area, the Hall Mountain territory was consistently occupied in 2002, 2004, 2004 and 2004.  In 2005, the Mission Creek territory was confirmed as active, though the Forest Service had suspected for several years prior that this was the case.  There were also multiple bird sightings, but never a nest discovery, on Mission Mountain.  SER252-254, 258-260, 263-273,

52

290-291, 296).   The record thus showed that goshawks were using suitable habitat in the Project area; in addition, there were many more active territories on the Bonners Ferry Ranger District as a whole.  ER252.

As this Court held in *McNair*, 537 F.3d at 994, the Forest Service is not required to do ground surveys, but Lands Council cannot fault the Forest Service's habitat suitability models on the basis of the goshawk surveys.  In addition, as the district court determined, the habitat models relied upon by the Forest Service are based on published scientific materials that support the Forest Service's conclusions regarding goshawk habitat, and the Forest Service fully analyzed the condition of the capable goshawk habitat in the Project area before and after the proposed actions.  ER32.  Lands Council does not offer any scientific support for a different model, or even for its assertion that the Forest Service's models are flawed.

Lands Council's reliance on *Native Ecosystems Council v. Tidwell*, 599 F.3d 926 (9th Cir. 2010) is misplaced.  In that case, the Court rejected the Forest Service's use of the proxy-on-proxy approach in connection with sage grouse, a management indicator species, where the panel majority found that the species had not been documented in the Project area for over 15 years, and that the Forest Service's conclusions regarding habitat were contradicted by the record.  *Id.* at 934-936.  The Court stated that "under the facts of this case, where the MIS

population has consistently declined and has not appeared in the Project area in nearly two decades, and where the agency's analysis conflicted with that of the scientific experts, the Forest Service's use of the proxy-on-proxy approach to ensure viability of sagebrush obligates did not comply with the dictates of NFMA to monitor population trends of the sage grouse as the selected MIS." *Id.* at 936.

*Native Ecosystems Council* is inapposite. The Forest Service has documented the presence of northern goshawk in the Project area, and Lands Council offers no scientific analysis calling into doubt the Forest Service's habitat analysis. The SFEIS stated that there are twenty-three goshawk territories, some with multiple nests, on the Bonners Ferry Ranger District, and two recorded territories in the Project area itself. ER252. Northern goshawk cannot be considered a nonexistent species in the IPNF and in the Project area.

Lands Council takes issue in very general terms with the Forest Service's conclusion that the Project will not endanger the viability of the northern goshawk or the fisher, or lead to Federal listing of those species. LCBr. 59-60. Lands Council objects to the Forest Service's use of the terms "may" and "should," but there is no scientific or legal basis for Lands Council's semantic argument, and it provides nothing to undermine the Forest Service's conclusion, based on considerable scientific support, regarding the viability of the northern goshawk and the fisher. Indeed, Sampson assessed the viability of northern goshawk, black

backed woodpecker, flammulated owl, and Pileated woodpecker (the old Growth

Management Indicator Species for the IPNF) and concluded viability was not a

concern, because (1) no scientific evidence exists that they are decreasing in

numbers, (2) increases in the extent and connectivity of forested habitat have

occurred since European settlement, (3) well-distributed and abundant habitat

exists across the landscape, (4) the level of timber harvest of the forested landscape

in the Northern Region is insignificant. SER328-334. Lands Council offers

nothing to undermine the Forest Service's reliance on Sampson and others.

With respect to northern goshawk, the SFEIS acknowledged that the Project

would reduce 30-acre contiguous nesting stands from 15 to 12 in the Project area,

but stated that possible short-term impacts would be offset by long-term

improvements in habitat for the species. ER291. The Forest Service also noted

that the Project would "allow goshawks to maintain their same general distribution,

thus maintaining species viability." *Id.*

Lands Council is incorrect to suggest that the Forest Service's analysis of the

Project's impact on the fisher was too general to meet the public disclosure

requirements of NEPA. LCBr. 60. The Forest Service's analysis of the fisher's

habitat needs and the Project's impacts on the fisher spans nearly six pages of the

SFEIS. ER 252-253, 291-295. The Forest Service based its assessment on

management guidelines from *Fisher Biology and Management in the Western*

*United States* (Heinemeyer and Jones, 1994) and *Forest Carnivores in Idaho* (IDF&G, 1995). SER303, 313. The SFEIS states that fishers are rare in northern Idaho, but that the scientific research shows that fishers prefer mature and old-growth conifer forests, particularly forests adjacent to riparian areas. ER253. Fishers prefer forests with high canopy closure of over 80% and avoid areas with low canopy closures less than 50%. *Id.* Fishers generally prefer grand fir and spruce forest and avoid dry ponderosa pine and Douglas-fir habitats, and thus the Forest Service concluded that there were approximately 2,296 acres of currently suitable habitat in the Mission Creek drainage, and that most of the Brush Lake area was not capable fisher habitat. ER253. Cumulatively, the Forest Service concluded, "the amount of fisher denning habitat is comparable to the quantity available historically as evidenced by comparison of the sum of mature/large and old growth forest size classes now versus historically." ER295.

The SFEIS concluded that while 449 acres of suitable fisher habitat will be harvested, there were several reasons to conclude that the Project would not adversely impact fisher viability. ER293-295. First, in areas where suitable habitat is selectively harvested, fisher habitat can be preserved through maintaining at least 50% overstory canopy cover, following regional snag protocols, and grapple piling rather than underburning "so some coarse woody debris remains on site." ER293. Of those acres that will be harvested more heavily, most "are in

upland areas on relatively steep slopes away from riparian areas, and probably only signify transitional range for fisher." *Id.* In the Brush Lake area, suitable stands are "generally small and widely scattered, and lack connectivity corridors linking them to other habitat." In addition, the trees in the Brush Creek area have a high level of root rot infestation, and the Forest Service expects that they will provide habitat for only a relatively short period of time. *Id.* In the Mission Creek area, suitable habitat is "somewhat isolated, and lack[s] connectivity to other suitable stands" or is "on the periphery of capable habitat and thus would not cause breaks in connectivity corridors if harvested." *Id.* Moreover, the Forest Supervisor concluded, "within treatment areas, snag retention guidelines, riparian buffers, and Lynx Conservation Assessment and Strategy Standards" will protect denning habitat and riparian habitats important to fishers. ER321. The Forest Supervisor also noted that elsewhere in the Project area fisher habitat is expanding, given that "fisher habitat is generally maturing at a faster rate than it has lost on the IPNF." *Id.*

As the foregoing discussion demonstrates, the Forest Service's analysis does not amount to "general statement about 'possible effects' and 'some risk,'" (*see* LCBr. 60, *citing Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1213 (9th Cir. 1998)), but rather constitutes the requisite "hard look" at the effect of the Project on the species as required under NEPA. *See generally*

*Wildwest Institute v. Bull*, 547 F.3d 1162, 1175-76 (9th Cir. 2008) (holding that the Forest Service adequately considered the effects on various sensitive and management indicator species).

Lands Council is incorrect to suggest that the Forest Supervisor failed to take into account that some biologists believe that thinning is detrimental to old growth, and the best approach is to leave it alone. LCBr. 18. To the contrary, the Forest Supervisor stated in the ROD that "there are differing opinions regarding [] management" of old growth, and that in reaching her decision, the Forest Supervisor "weighed the desires of those who want old growth to remain untouched against the need to return the role of fire back into the ecosystem, particularly in ponderosa pine stands with old growth characteristics, and to restore dry forest structure to open conditions featuring large diameter ponderosa pine." ER330. The Forest Supervisor stated that "[b]ased on scientific evidence presented in the SFEIS (p.4-29) it is clear to me that maintaining dry forest old growth through no action is not a viable long-term management strategy." ER327. As the ROD explained, these trees "need relatively open spaces to maintain modest growth rate and survive several hundred years." *Id.*

Lands Council ignores the reality that the failure to implement the actions called for by the Mission Brush Project will have devastating impacts on old growth and old growth associated species. The SFEIS estimates that if no action is

taken, then over the next 50 years, old growth would drop from the current level of 11% to 3% and older and mature forests would decrease from 31% to 6% of the area. ER258. In contrast, younger forests would increase from the present 28% to 82% of the area. *Id.* The Forest Service concluded, based on the scientific evidence in the record, that taking no action threatens old growth and the viability of old growth associated species, not the Mission Brush Project. That conclusion was not arbitrary or capricious and is entitled to deference.

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be affirmed.

Respectfully Submitted,

IGNACIA S. MORENO
Assistant Attorney General

OF COUNSEL:

DAVID C. SHILTON
SUSAN L. PACHOLSKI

ALAN J. CAMPBELL
U.S. Department of
  Agriculture
Office of the General
  Counsel
Missoula, Montana

U.S. Department of Justice
Environment & Natural Resources Division
P.O. Box 23795
 L'Enfant Plaza Station
Washington, D.C. 20026
(202) 307-6105

# CERTIFICATE OF COMPLIANCE

I certify that pursuant to Fed. R. App. P. 32(a)(7)(C) and Ninth Circuit Rule

32-1, the attached answering brief is proportionately spaced, has a typeface of 14

points or more and contains 13,952 words.

/s/ Susan L. Pacholski
Susan L. Pacholski
Attorney

## STATEMENT OF RELATED CASES

Counsel for the federal appellees is unaware of any cases currently pending

before this Court that are related within the meaning of Ninth Circuit Rule 28-2.6.

**ADDENDUM**

## ADDENDUM TABLE OF CONTENTS

**Item**

5 U.S.C. § 704 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A

5 U.S.C. § 706 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . B

7 U.S.C. § 6912 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . C

16 U.S.C. § 1604 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . D

36 C.F.R. § 251.101 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . E

**ADDENDUM A**

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface to the report.

AMENDMENTS

1976—Pub. L. 94–574 provided that if no special statutory review proceeding is applicable, the action for judicial review may be brought against the United States, the agency by its official title, or the appropriate officer as defendant.

### § 704. Actions reviewable

Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review. A preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action. Except as otherwise expressly required by statute, agency action otherwise final is final for the purposes of this section whether or not there has been presented or determined an application for a declaratory order, for any form of reconsideration, or, unless the agency otherwise requires by rule and provides that the action meanwhile is inoperative, for an appeal to superior agency authority.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 392.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| ................. | 5 U.S.C. 1009(c). | June 11, 1946, ch. 324, § 10(c), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface of this report.

### § 705. Relief pending review

When an agency finds that justice so requires, it may postpone the effective date of action taken by it, pending judicial review. On such conditions as may be required and to the extent necessary to prevent irreparable injury, the reviewing court, including the court to which a case may be taken on appeal from or on application for certiorari or other writ to a reviewing court, may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 393.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| ................. | 5 U.S.C. 1009(d). | June 11, 1946, ch. 324, § 10(d), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface of this report.

### § 706. Scope of review

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

(1) compel agency action unlawfully withheld or unreasonably delayed; and

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 393.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| ................. | 5 U.S.C. 1009(e). | June 11, 1946, ch. 324, § 10(e), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface of this report.

ABBREVIATION OF RECORD

Pub. L. 85–791, Aug. 28, 1958, 72 Stat. 941, which authorized abbreviation of record on review or enforcement of orders of administrative agencies and review on the original papers, provided, in section 35 thereof, that: ''This Act [see Tables for classification] shall not be construed to repeal or modify any provision of the Administrative Procedure Act [see Short Title note set out preceding section 551 of this title].''

## CHAPTER 8—CONGRESSIONAL REVIEW OF AGENCY RULEMAKING

Sec.
801.　Congressional review.
802.　Congressional disapproval procedure.
803.　Special rule on statutory, regulatory, and judicial deadlines.
804.　Definitions.
805.　Judicial review.
806.　Applicability; severability.
807.　Exemption for monetary policy.
808.　Effective date of certain rules.

### § 801. Congressional review

(a)(1)(A) Before a rule can take effect, the Federal agency promulgating such rule shall submit to each House of the Congress and to the Comptroller General a report containing—

(i) a copy of the rule;

(ii) a concise general statement relating to the rule, including whether it is a major rule; and

(iii) the proposed effective date of the rule.

(B) On the date of the submission of the report under subparagraph (A), the Federal agency pro-

**ADDENDUM B**

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface to the report.

AMENDMENTS

1976—Pub. L. 94–574 provided that if no special statutory review proceeding is applicable, the action for judicial review may be brought against the United States, the agency by its official title, or the appropriate officer as defendant.

## § 704. Actions reviewable

Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review. A preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action. Except as otherwise expressly required by statute, agency action otherwise final is final for the purposes of this section whether or not there has been presented or determined an application for a declaratory order, for any form of reconsideration, or, unless the agency otherwise requires by rule and provides that the action meanwhile is inoperative, for an appeal to superior agency authority.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 392.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| .................. | 5 U.S.C. 1009(c). | June 11, 1946, ch. 324, §10(c), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface of this report.

## § 705. Relief pending review

When an agency finds that justice so requires, it may postpone the effective date of action taken by it, pending judicial review. On such conditions as may be required and to the extent necessary to prevent irreparable injury, the reviewing court, including the court to which a case may be taken on appeal from or on application for certiorari or other writ to a reviewing court, may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 393.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| .................. | 5 U.S.C. 1009(d). | June 11, 1946, ch. 324, §10(d), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface of this report.

## § 706. Scope of review

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

(1) compel agency action unlawfully withheld or unreasonably delayed; and

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 393.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| .................. | 5 U.S.C. 1009(e). | June 11, 1946, ch. 324, §10(e), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface of this report.

ABBREVIATION OF RECORD

Pub. L. 85–791, Aug. 28, 1958, 72 Stat. 941, which authorized abbreviation of record on review or enforcement of orders of administrative agencies and review on the original papers, provided, in section 35 thereof, that: ''This Act [see Tables for classification] shall not be construed to repeal or modify any provision of the Administrative Procedure Act [see Short Title note set out preceding section 551 of this title].''

# CHAPTER 8—CONGRESSIONAL REVIEW OF AGENCY RULEMAKING

Sec.
801.	Congressional review.
802.	Congressional disapproval procedure.
803.	Special rule on statutory, regulatory, and judicial deadlines.
804.	Definitions.
805.	Judicial review.
806.	Applicability; severability.
807.	Exemption for monetary policy.
808.	Effective date of certain rules.

## § 801. Congressional review

(a)(1)(A) Before a rule can take effect, the Federal agency promulgating such rule shall submit to each House of the Congress and to the Comptroller General a report containing—

(i) a copy of the rule;

(ii) a concise general statement relating to the rule, including whether it is a major rule; and

(iii) the proposed effective date of the rule.

(B) On the date of the submission of the report under subparagraph (A), the Federal agency pro-

**ADDENDUM C**

c

**Effective: October 1, 2009**

United States Code Annotated Currentness
    Title 7. Agriculture
        Chapter 98. Department of Agriculture Reorganization
        Subchapter I. General Reorganization Authorities
        → **§ 6912. Authority of Secretary to delegate transferred functions**

(a) Delegation of authority

    (1) Delegation authorized

Subject to paragraph (2), the Secretary may delegate to any agency, office, officer, or employee of the Department the authority to perform any function transferred to the Secretary under section 6911(a) of this title or any other function vested in the Secretary as of October 13, 1994. The authority provided in the preceding sentence includes the authority to establish, consolidate, alter, or discontinue any agency, office, or other administrative unit of the Department.

    (2) Condition on authority

The delegation authority provided by paragraph (1) shall be subject to--

    **(A)** sections 6942, 6971(f), 6993, and 2204e of this title and subsections (a) and (b)(1) of section 6981 of this title;

    **(B)** sections 5692 and 5693 of this title; and

    **(C)** section 590h(b)(5) of Title 16.

(b) Cost-benefit analysis required for name change

    (1) Analysis required

Except as provided in paragraph (2), the Secretary shall conduct a cost-benefit analysis before changing the name of any agency, office, division, or other unit of the Department to ensure that the benefits to be derived from changing the name of the agency, office, division, or other unit outweigh the expense of executing the name change.

    (2) Exception

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Paragraph (1) shall not apply with respect to any name change required or authorized by this chapter.

(c) Public comment on proposed reorganization

To the extent that the implementation of the authority provided to the Secretary by this chapter to reorganize the Department involves the creation of new agencies or offices within the Department or the delegation of major functions or major groups of functions to any agency or office of the Department (or the officers or employees of such agency or office), the Secretary shall, to the extent considered practicable by the Secretary--

**(1)** give appropriate advance public notice of the proposed reorganization action or delegation; and

**(2)** afford appropriate opportunity for interested parties to comment on the proposed reorganization action or delegation.

(d) Interagency transfer of records, property, personnel, and funds

(1) Related transfers

Subject to paragraph (2), as part of the transfer or delegation of a function of the Department made or authorized by this chapter, the Secretary may transfer within the Department--

**(A)** any of the records, property, or personnel affected by the transfer or delegation of the function; and

**(B)** unexpended balances (available or to be made available for use in connection with the transferred or delegated function) of appropriations, allocations, or other funds of the Department.

(2) Applicable law relating to funds transfer

Section 1531 of Title 31 shall apply to any transfer of funds under paragraph (1).

(e) Exhaustion of administrative appeals

Notwithstanding any other provision of law, a person shall exhaust all administrative appeal procedures established by the Secretary or required by law before the person may bring an action in a court of competent jurisdiction against--

**(1)** the Secretary;

**(2)** the Department; or

**(3)** an agency, office, officer, or employee of the Department.

CREDIT(S)

(Pub.L. 103-354, Title II, § 212, Oct. 13, 1994, 108 Stat. 3210; Pub.L. 110-234, Title VII, § 7511(c)(27), May 22, 2008, 122 Stat. 1270; Pub.L. 110-246, § 4(a), Title VII, § 7511(c)(27), June 18, 2008, 122 Stat. 1664, 2031.)

Current through P.L. 111-172 (excluding P.L. 111-148, 111-152, and 111-159) approved 5-24-10

Westlaw. (C) 2010 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

END OF DOCUMENT

**ADDENDUM D**


▷

**Effective:[See Text Amendments]**

United States Code Annotated Currentness
  Title 16. Conservation
    Chapter 36. Forest and Rangeland Renewable Resources Planning (Refs & Annos)
      Subchapter I. Planning (Refs & Annos)
      ➡ **§ 1604. National Forest System land and resource management plans**

(a) Development, maintenance, and revision by Secretary of Agriculture as part of program; coordination

As a part of the Program provided for by section 1602 of this title, the Secretary of Agriculture shall develop, maintain, and, as appropriate, revise land and resource management plans for units of the National Forest System, coordinated with the land and resource management planning processes of State and local governments and other Federal agencies.

(b) Criteria

In the development and maintenance of land management plans for use on units of the National Forest System, the Secretary shall use a systematic interdisciplinary approach to achieve integrated consideration of physical, biological, economic, and other sciences.

(c) Incorporation of standards and guidelines by Secretary; time of completion; progress reports; existing management plans

The Secretary shall begin to incorporate the standards and guidelines required by this section in plans for units of the National Forest System as soon as practicable after October 22, 1976, and shall attempt to complete such incorporation for all such units by no later than September 30, 1985. The Secretary shall report to the Congress on the progress of such incorporation in the annual report required by section 1606(c) of this title. Until such time as a unit of the National Forest System is managed under plans developed in accordance with this subchapter, the management of such unit may continue under existing land and resource management plans.

(d) Public participation in management plans; availability of plans; public meetings

The Secretary shall provide for public participation in the development, review, and revision of land management plans including, but not limited to, making the plans or revisions available to the public at convenient locations in the vicinity of the affected unit for a period of at least three months before final adoption, during which period the Secretary shall publicize and hold public meetings or comparable processes at locations that foster public participation in the review of such plans or revisions.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

(e) Required assurances

In developing, maintaining, and revising plans for units of the National Forest System pursuant to this section, the Secretary shall assure that such plans--

**(1)** provide for multiple use and sustained yield of the products and services obtained therefrom in accordance with the Multiple-Use Sustained-Yield Act of 1960 [16 U.S.C.A. §§ 528-531], and, in particular, include co-ordination of outdoor recreation, range, timber, watershed, wildlife and fish, and wilderness; and

**(2)** determine forest management systems, harvesting levels, and procedures in the light of all of the uses set forth in subsection (c)(1) of this section, the definition of the terms "multiple use" and "sustained yield" as provided in the Multiple-Use Sustained-Yield Act of 1960, and the availability of lands and their suitability for resource management.

(f) Required provisions

Plans developed in accordance with this section shall--

**(1)** form one integrated plan for each unit of the National Forest System, incorporating in one document or one set of documents, available to the public at convenient locations, all of the features required by this section;

**(2)** be embodied in appropriate written material, including maps and other descriptive documents, reflecting proposed and possible actions, including the planned timber sale program and the proportion of probable methods of timber harvest within the unit necessary to fulfill the plan;

**(3)** be prepared by an interdisciplinary team. Each team shall prepare its plan based on inventories of the applicable resources of the forest;

**(4)** be amended in any manner whatsoever after final adoption after public notice, and, if such amendment would result in a significant change in such plan, in accordance with the provisions of subsections (e) and (f) of this section and public involvement comparable to that required by subsection (d) of this section; and

**(5)** be revised (A) from time to time when the Secretary finds conditions in a unit have significantly changed, but at least every fifteen years, and (B) in accordance with the provisions of subsections (e) and (f) of this section and public involvement comparable to that required by subsection (d) of this section.

(g) Promulgation of regulations for development and revision of plans; environmental considerations; resource management guidelines; guidelines for land management plans

As soon as practicable, but not later than two years after October 22, 1976, the Secretary shall in accordance

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

with the procedures set forth in section 553 of Title 5, promulgate regulations, under the principles of the Multiple-Use Sustained-Yield Act of 1960 [16 U.S.C.A. §§ 528 to 531], that set out the process for the development and revision of the land management plans, and the guidelines and standards prescribed by this subsection. The regulations shall include, but not be limited to--

**(1)** specifying procedures to insure that land management plans are prepared in accordance with the National Environmental Policy Act of 1969 [42 U.S.C.A. § 4321 et seq.], including, but not limited to, direction on when and for what plans an environmental impact statement required under section 102(2)(C) of that Act [42 U.S.C.A. § 4332(2)(C)] shall be prepared;

**(2)** specifying guidelines which--

**(A)** require the identification of the suitability of lands for resource management;

**(B)** provide for obtaining inventory data on the various renewable resources, and soil and water, including pertinent maps, graphic material, and explanatory aids; and

**(C)** provide for methods to identify special conditions or situations involving hazards to the various resources and their relationship to alternative activities;

**(3)** specifying guidelines for land management plans developed to achieve the goals of the Program which--

**(A)** insure consideration of the economic and environmental aspects of various systems of renewable resource management, including the related systems of silviculture and protection of forest resources, to provide for outdoor recreation (including wilderness), range, timber, watershed, wildlife, and fish;

**(B)** provide for diversity of plant and animal communities based on the suitability and capability of the specific land area in order to meet overall multiple-use objectives, and within the multiple-use objectives of a land management plan adopted pursuant to this section, provide, where appropriate, to the degree practicable, for steps to be taken to preserve the diversity of tree species similar to that existing in the region controlled by the plan;

**(C)** insure research on and (based on continuous monitoring and assessment in the field) evaluation of the effects of each management system to the end that it will not produce substantial and permanent impairment of the productivity of the land;

**(D)** permit increases in harvest levels based on intensified management practices, such as reforestation, thinning, and tree improvement if (i) such practices justify increasing the harvests in accordance with the Multiple-Use Sustained-Yield Act of 1960, and (ii) such harvest levels are decreased at the end of each planning period if such practices cannot be successfully implemented or funds are not received to permit such prac-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

tices to continue substantially as planned;

**(E)** insure that timber will be harvested from National Forest System lands only where--

    **(i)** soil, slope, or other watershed conditions will not be irreversibly damaged;

    **(ii)** there is assurance that such lands can be adequately restocked within five years after harvest;

    **(iii)** protection is provided for streams, streambanks, shorelines, lakes, wetlands, and other bodies of water from detrimental changes in water temperatures, blockages of water courses, and deposits of sediment, where harvests are likely to seriously and adversely affect water conditions or fish habitat; and

    **(iv)** the harvesting system to be used is not selected primarily because it will give the greatest dollar return or the greatest unit output of timber; and

**(F)** insure that clearcutting, seed tree cutting, shelterwood cutting, and other cuts designed to regenerate an evenaged stand of timber will be used as a cutting method on National Forest System lands only where--

    **(i)** for clearcutting, it is determined to be the optimum method, and for other such cuts it is determined to be appropriate, to meet the objectives and requirements of the relevant land management plan;

    **(ii)** the interdisciplinary review as determined by the Secretary has been completed and the potential environmental, biological, esthetic, engineering, and economic impacts on each advertised sale area have been assessed, as well as the consistency of the sale with the multiple use of the general area;

    **(iii)** cut blocks, patches, or strips are shaped and blended to the extent practicable with the natural terrain;

    **(iv)** there are established according to geographic areas, forest types, or other suitable classifications the maximum size limits for areas to be cut in one harvest operation, including provision to exceed the established limits after appropriate public notice and review by the responsible Forest Service officer one level above the Forest Service officer who normally would approve the harvest proposal: *Provided*, That such limits shall not apply to the size of areas harvested as a result of natural catastrophic conditions such as fire, insect and disease attack, or windstorm; and

    **(v)** such cuts are carried out in a manner consistent with the protection of soil, watershed, fish, wildlife, recreation, and esthetic resources, and the regeneration of the timber resource.

(h) Scientific committee to aid in promulgation of regulations; termination; revision committees; clerical and technical assistance; compensation of committee members

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

**(1)** In carrying out the purposes of subsection (g) of this section, the Secretary of Agriculture shall appoint a committee of scientists who are not officers or employees of the Forest Service. The committee shall provide scientific and technical advice and counsel on proposed guidelines and procedures to assure that an effective interdisciplinary approach is proposed and adopted. The committee shall terminate upon promulgation of the regulations, but the Secretary may, from time to time, appoint similar committees when considering revisions of the regulations. The views of the committees shall be included in the public information supplied when the regulations are proposed for adoption.

**(2)** Clerical and technical assistance, as may be necessary to discharge the duties of the committee, shall be provided from the personnel of the Department of Agriculture.

**(3)** While attending meetings of the committee, the members shall be entitled to receive compensation at a rate of $100 per diem, including traveltime, and while away from their homes or regular places of business they may be allowed travel expenses, including per diem in lieu of subsistence, as authorized by section 5703 of Title 5, for persons in the Government service employed intermittently.

(i) Consistency of resource plans, permits, contracts, and other instruments with land management plans; revision

Resource plans and permits, contracts, and other instruments for the use and occupancy of National Forest System lands shall be consistent with the land management plans. Those resource plans and permits, contracts, and other such instruments currently in existence shall be revised as soon as practicable to be made consistent with such plans. When land management plans are revised, resource plans and permits, contracts, and other instruments, when necessary, shall be revised as soon as practicable. Any revision in present or future permits, contracts, and other instruments made pursuant to this section shall be subject to valid existing rights.

(j) Effective date of land management plans and revisions

Land management plans and revisions shall become effective thirty days after completion of public participation and publication of notification by the Secretary as required under subsection (d) of this section.

(k) Development of land management plans

In developing land management plans pursuant to this subchapter, the Secretary shall identify lands within the management area which are not suited for timber production, considering physical, economic, and other pertinent factors to the extent feasible, as determined by the Secretary, and shall assure that, except for salvage sales or sales necessitated to protect other multiple-use values, no timber harvesting shall occur on such lands for a period of 10 years. Lands once identified as unsuitable for timber production shall continue to be treated for reforestation purposes, particularly with regard to the protection of other multiple-use values. The Secretary shall review his decision to classify these lands as not suited for timber production at least every 10 years and shall return these lands to timber production whenever he determines that conditions have changed so that they have become suitable for timber production.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

(l) Program evaluation; process for estimating long-term costs and benefits; summary of data included in annual report

The Secretary shall--

   (1) formulate and implement, as soon as practicable, a process for estimating long-terms [FN1] costs and benefits to support the program evaluation requirements of this subchapter. This process shall include requirements to provide information on a representative sample basis of estimated expenditures associated with the reforestation, timber stand improvement, and sale of timber from the National Forest System, and shall provide a comparison of these expenditures to the return to the Government resulting from the sale of timber; and

   (2) include a summary of data and findings resulting from these estimates as a part of the annual report required pursuant to section 1606(c) of this title, including an identification on a representative sample basis of those advertised timber sales made below the estimated expenditures for such timber as determined by the above cost process; and [FN2]

(m) Establishment of standards to ensure culmination of mean annual increment of growth; silvicultural practices; salvage harvesting; exceptions

The Secretary shall establish--

   (1) standards to insure that, prior to harvest, stands of trees throughout the National Forest System shall generally have reached the culmination of mean annual increment of growth (calculated on the basis of cubic measurement or other methods of calculation at the discretion of the Secretary): *Provided*, That these standards shall not preclude the use of sound silvicultural practices, such as thinning or other stand improvement measures: *Provided further*, That these standards shall not preclude the Secretary from salvage or sanitation harvesting of timber stands which are substantially damaged by fire, windthrow or other catastrophe, or which are in imminent danger from insect or disease attack; and

   (2) exceptions to these standards for the harvest of particular species of trees in management units after consideration has been given to the multiple uses of the forest including, but not limited to, recreation, wildlife habitat, and range and after completion of public participation processes utilizing the procedures of subsection (d) of this section.

CREDIT(S)

(Pub.L. 93-378, § 6, formerly § 5, Aug. 17, 1974, 88 Stat. 477; renumbered § 6 and amended Pub.L. 94-588, §§ 2, 6, 12(a), Oct. 22, 1976, 90 Stat. 2949, 2952, 2958.)

   [FN1] So in original. Probably should be "long-term".

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

[FN2] So in original. The "; and" probably should be a period.

Current through P.L. 111-172 (excluding P.L. 111-148, 111-152, and 111-159) approved 5-24-10

Westlaw. (C) 2010 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

**ADDENDUM E**

administrative review decision of the Department of Agriculture.

(d) When an official exercises the discretion in § 251.87(d) or § 251.87(e) of this subpart to review a dismissal or appeal decision, the discretionary review shall be made on the existing appeal record and the lower level Reviewing Officer's appeal decision. The record shall not be reopened to accept additional submissions from any source, including the Reviewing Officer whose appeal decision is being reviewed.

(e) When an official exercises discretion to review an appeal decision, a Reviewing Officer may extend a stay, in whole or in part, during pendency of the discretionary review.

(f) The second level Reviewing Officer shall conclude the review within 30 days of the date of notice issued to an appellant that the lower level decision will be reviewed.

(g) If a discretionary review decision is not issued by the end of the 30-day review period, appellants and intervenors shall be deemed to have exhausted their administrative remedies for purposes of judicial review. In such case, appellants, intervenors, and the lower level Reviewing Officer shall be notified by the discretionary level officer.

(h) The Reviewing Officer shall provide a copy of the decision to all appellants, intervenors, the Deciding Officer, and the lower level Reviewing Officer.

[54 FR 3362, Jan. 23, 1989, as amended at 54 FR 34510, Aug. 21, 1989; 55 FR 7896, Mar. 6, 1990]

### § 251.101 Policy in event of judicial proceedings.

It is the position of the Department of Agriculture that any filing for Federal judicial review of and relief from a decision appealable under this subpart is premature and inappropriate, unless the appellant has first sought to resolve the dispute by invoking and exhausting the procedures of this subpart. This position may be waived only upon a written finding by the Chief.

### § 251.102 Applicability and effective date.

(a) Except where applicants or holders elect the decision review procedures of part 217 of this chapter, appealable decisions arising from the issuance, approval, and administration of written instruments authorizing occupancy and use of National Forest System lands made on or after February 22, 1989, shall be subject to the procedures of this part.

(b) Decisions made before February 22, 1989, arising from the issuance, approval, and administration of written instruments authorizing occupancy and use of National Forest System lands shall be subject to appeal under the provisions of 36 CFR 211.18.

[54 FR 6892, Feb. 15, 1989]

### § 251.103 Mediation of term grazing permit disputes.

(a) *Decisions subject to mediation.* In those States with Department of Agriculture certified mediation programs, any holder of a term grazing permit may request mediation, if a Deciding Officer issues a decision to suspend or cancel a term grazing permit, in whole or in part, as authorized by 36 CFR 222.4 (a)(2)(i), (ii), (iv), (v), and (a)(3) through (a)(6).

(b) *Parties.* Notwithstanding the provisions addressing parties to an appeal at § 251.86, only the following may participate in mediation of term grazing permit disputes under this section:

(1) A mediator authorized to mediate under a Department of Agriculture State certified mediation program:

(2) The Deciding Officer who made the decision being mediated, or designee;

(3) The holder whose term grazing permit is the subject of the Deciding Officer's decision and who has requested mediation in the notice of appeal;

(4) The holder's creditors, if applicable; and

(5) Legal counsel, if applicable. The Forest Service will have legal counsel participate only if the permittee choose to have legal counsel.

(c) *Timeframe.* When an appellant simultaneously requests mediation at the time an appeal is filed (§ 251.84), the Reviewing Officer shall immediately notify, by certified mail, all parties to the appeal that, in order to allow for mediation, the appeal is suspended for 45 calendar days from the date of the

| 9th Circuit Case Number(s) | 09-36026 |
|---|---|

**NOTE:** To secure your input, you should print the filled-in form to PDF (File > Print > *PDF Printer/Creator*).

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## CERTIFICATE OF SERVICE
### When All Case Participants are Registered for the Appellate CM/ECF System

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on (date) 06/03/2010 .

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Signature (use "s/" format) | s/Susan L. Pacholski

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## CERTIFICATE OF SERVICE
### When Not All Case Participants are Registered for the Appellate CM/ECF System

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on (date) .

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

I further certify that some of the participants in the case are not registered CM/ECF users. I have mailed the foregoing document by First-Class Mail, postage prepaid, or have dispatched it to a third party commercial carrier for delivery within 3 calendar days to the following non-CM/ECF participants:

Signature (use "s/" format)